203 P.3d 519 (2009)
MESA COUNTY BOARD OF COUNTY COMMISSIONERS, Main Street Café, Evan Gluckman, Donald Shonkwiler, John Bozek, Sharon Johnson, Rick Nevin, and all similarly situated Colorado taxpayers and registered voters, Plaintiffs-Appellees,
v.
STATE of Colorado; Bill Ritter, Jr., in his official capacity as the Governor of Colorado; and Colorado Department of Education, Defendants-Appellants.
No. 08SA216.
Supreme Court of Colorado, En Banc.
March 16, 2009.
*522 Isaacson Rosenbaum P.C., Mark G. Grueskin, Jessica Runyan Allen, Office of the Governor, Thomas M. Rogers, III, Legal Counsel, Craig R. Welling, Pamela A. Campos, Denver, Colorado, Attorneys for Defendants-Appellants State of Colorado and Bill Ritter, Jr.
Sherman & Howard, LLC, John W. Mill, Angela R. Whitford, Denver, Colorado, Attorneys for Defendant-Appellant Colorado Department of Education.
Hale Friesen LLP, Richard A. Westfall, Allan L. Hale, Denver, Colorado, Attorneys for Plaintiffs-Appellees.
Colorado Association of School Boards, Kathleen A. Sullivan, Denver, Colorado, Alexander Halpern LLC, Alexander Halpern, Michelle Murphy, Boulder, Colorado, Attorneys for Amici Curiae Colorado Association of School Boards, Colorado Association of School Executives and Denver Public Schools.
Colorado Education Association, Martha R. Houser, Denver, Colorado, Attorney for Amicus Curiae Colorado Education Association.
Hogan & Hartson LLP, Sean R. Gallagher, Tamera D. Westerberg, Denver, Colorado, Attorneys for Amici Curiae Eagle County, Boulder County, Larimer County and Ouray County.
Kelly Garnsey Hubbell + Lass LLC, Terrance R. Kelly, Denver, Colorado, Attorneys for Amicus Curiae Colorado Center on Law and Policy.
Kutak Rock LLP, Craig N. Johnson, Michael R. Johnson, Richard L. Buddin, Denver, Colorado, Attorneys for Amicus Curiae Special District Association of Colorado and Colorado Municipal League.
John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Geoffrey N. Blue, Deputy Attorney General, Denver, Colorado, Attorneys for Amicus Curiae The Attorney General, John Suthers, in his official capacity and on behalf of The People of the State of Colorado.
Kamlet Shepherd & Reichert LLP, Barry A. Schwartz, E. Lee Reichert, Denver, Colorado, Attorneys for Amicus Curiae The Colorado Children's Campaign.
Chief Justice MULLARKEY delivers the Opinion of the Court.

I. Introduction
This is an appeal from a declaratory judgment order of the Denver District Court holding unconstitutional the amendments made by SB 07-199 to the local share of the funding formula of the School Finance Act. The district court held that SB 07-199 violated article X, section 20 of the Colorado Constitution. We reverse the district court's order and remand the case with directions to enter judgment for the defendants.
For many decades, the public elementary and secondary schools in Colorado have been funded jointly by local school districts and the state according to a formula set forth in the School Finance Act. The local share *523 of school funding relies primarily on property tax revenues, while the state's share consists mainly of general tax revenues. The School Finance Act funding formula and the state's contribution to it are intended to adjust for the disparities in property values throughout the state and to make per pupil expenditures more equitable. See generally Lujan v. Colo. State Bd. of Educ., 649 P.2d 1005, 1011 (Colo.1982).
Article X, section 20, limits the amount of revenue that a taxing authority may collect and retain or expend. If revenues collected in a given year exceed the limits set by article X, section 20, the taxing entity must refund the excess money to taxpayers unless voters approve the retention of excess revenues.
In the 2007 amendments to the Public School Finance Act at issue here, the General Assembly changed the local share of public school funding to reflect the fact that voters in 174 of the state's 178 school districts approved broadly worded ballot issues waiving the revenue limits of article X, section 20. The effect of SB 07-199 is to shift some of the burden of funding public schools from the state back to the local school districts. In its first year of operation, SB 07-199 shifted funding liability of approximately $117.8 million from the state to local school districts.
When it issued its declaratory judgment order, the district court did not have the benefit of our recent decision in Barber v. Ritter, 196 P.3d 238 (Colo.2008), in which we held that a statute challenged under article X, section 20 must be proven to be unconstitutional beyond a reasonable doubt. The trial court erroneously held that the relevant test of SB 07-199's constitutionality came from the interpretive guideline included in the text of article X, section 20 to "reasonably restrain most the growth of government." Applying this erroneous standard, the trial court concluded that: (1) SB 07-199 "constitutes a net tax revenue gain to the State of Colorado"; (2) SB 07-199 was not a change in state tax policy requiring a statewide vote; (3) voter approval was required under subsection 7(c) of article X, section 20; and (4) the waiver elections held in the local school districts did not satisfy subsection (7)(c).
We conclude that the General Assembly was acting within constitutional limits when it amended the School Finance Act. SB 07-199's treatment of the school districts as the relevant taxing authorities for purposes of waiving the revenue limits is consistent with the constitutional provisions governing dual state/local funding and the constitutional provisions applicable to public education. Interpreting article X, section 20's various provisions harmoniously leads to the conclusion that only one election at the school district level was required in this case, and the local school district elections fulfilled that election requirement. There is ample evidence to find SB 07-199 constitutional and we find the plaintiffs failed to show it violated any constitutional provision of article X, section 20.

II. Background, Facts and Procedural History
Article IX, section 2, of the Colorado Constitution requires the General Assembly to provide a uniform system of free public schools throughout the state. Since statehood, public schools in Colorado have been financed by locally levied property taxes and state contributions. Because of the obligation to provide a uniform public school system, the state has utilized various mechanisms in its attempt to reduce the wide disparity in per pupil spending across school districts. To this end, the state first provided direct support of local school districts in 1935. That act was challenged and found to be constitutional in Wilmore v. Annear, 100 Colo. 106, 65 P.2d 1433 (1937). Since that case, public schools in Colorado have been principally supported by a combination of local property tax levies and direct state contributions.
The General Assembly enacted the first School Finance Act in 1952 and provided each school district with an equalization "support level" in an effort to make the amount of money spent per pupil more equitable across the state. Lujan, 649 P.2d at 1011. This Act has changed over time, but it has always aimed at eliminating spending disparities between school districts through a combination *524 of local and state funding. Id. In 2007, the legislature again amended the School Finance Act through SB 07-199.
The case before us concerns the interaction between the amended School Finance Act and article X, section 20 of the Colorado Constitution. After the voters adopted this constitutional provision in 1992, the General Assembly amended the School Finance Act in 1993 to incorporate by reference article X, section 20's property tax revenue limit. See An Act Concerning the Financing of Public Schools, ch. 196, sec. 4, § 22-53-114, 1993 Colo. Sess. Laws 878, 881-82. From that point until 2006, the School Finance Act limited school districts' property tax mill levies to the lesser of:
(I) The number of mills levied by the district for the immediately preceding property tax year;
(II) The number of mills that will generate property tax revenue in an amount equal to the district's total program for the applicable budget year minus the district's minimum state aid and minus the amount of specific ownership tax revenue paid to the district; [or]
(III) . . . the number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution . . . .

§ 22-54-106(2), C.R.S. (1994) (emphasis added).[1]
The property tax revenue limit in article X, section 20, subsection (7)(c) reads in relevant part:
The maximum annual percentage change in each district's property tax revenue equals inflation in the prior calendar year plus annual local growth, adjusted for property tax revenue changes approved by voters after 1991.
Colo. Const. art. X, § 20(7)(c). Voters may waive this limit under subsection (7)(d), which provides in relevant part:
If revenue from sources not excluded from fiscal year spending exceeds these limits, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset . . . Voter-approved revenue changes do not require a tax rate change.
Colo. Const. art. X, § 20(7)(d); see also Havens v. Bd. of County Comm'rs, 924 P.2d 517 (Colo.1996). By adding subsection (c) to section 22-54-106(2), the School Finance Act incorporated by reference the revenue limit, which as quoted above, includes the capacity for adjustments authorized by waiver election.
Soon after article X, section 20 became effective, school districts found themselves unable to retain all revenue due them under the School Finance Act and other sources, such as concession contracts and non-federal grants, because of the spending limit imposed on local districts by subsection (7)(b),[2] and the property tax revenue limit of subsection (7)(c) of article X, section 20. Starting in 1995, voters in local school districts began to exempt their districts from the revenue limitations through waiver elections as authorized by subsection (7)(d) of article X, section 20. Between 1995 and 2006, 175 of the 178 school districts in Colorado conducted successful waiver elections. All but one of these measures contained broadly worded ballot language.[3] Although the exact ballot language differed among districts, these measures authorized the school district to retain and expend "all revenue" or "full revenue" *525 from "any source," notwithstanding the limitations of article X, section 20.
Despite these waiver elections, the Colorado Department of Education ("CDE") continued to advise local school districts to calculate mill levies in accordance with the growth-plus-inflation limit of subsection (7)(c) when it computed the local school districts' shares of public school funding. The practical result was that, in districts where property tax revenue grew faster than the subsection (7)(c) limit allowed, the voter-approved waiver of the revenue limit was not applied, and school districts were required to reduce their mill levies or face reductions in the state's share of total program funding.
In general, after the 1993 amendments to the School Finance Act, the process worked in the following manner. First, the General Assembly determined a per pupil funding amount that applied to all school districts. Section 22-54-106 then provided the method to determine the state and local shares of a school district's total program. Effectively, it required a school district to raise revenue in accordance with the limits referenced in section 22-54-106 in order to obtain maximum funding from the state. Before the passage of SB 07-199, the CDE interpreted section 22-54-106 to include the article X, section 20 property tax revenue limit, regardless of whether a waiver election had taken place. As a practical matter, the property tax revenue limit was the operative limit for a district's mill levy. The appropriately certified amount of property tax was then collected by the relevant county treasurer for each school district. The state backfilled the remaining portion of a school district's total program funding amount, thereby arriving at the statutorily required per pupil funding level and providing a minimum amount of funding for all students. Any amount of money a school district retained above the School Finance Act limits resulted in it receiving a correlative reduction in state equalization funding. Over time, the great majority of school districts reduced their mill levies in order to remain within the growth-plus-inflation limit of subsection (7)(c), and to receive the maximum funding possible from the state under the School Finance Act.
Eventually, this led to a large reduction in mill levies and the local share of school funding. In the 1993-1994 fiscal year, when the subsection (7)(c) limit first became operative, school district mill levies averaged thirty-eight mills. As a result of the "ratcheting down" effect of the property tax revenue limit, school district mill levies averaged twenty-one mills by the 2006-2007 fiscal year.[4] These reduced tax rates caused the local school district share of total program funding under the School Finance Act to decrease, and the state's share of total program funding to increase. Evidence from the Office of State Planning and Budgeting presented at trial showed that in 1994 local school districts provided 47% of public school total program funding requirements and the state paid the remaining 53%. By 2007, local school districts paid only 36% while the state's share of total program funding increased to 64%.
In 2004, the growth of the state's share of total program funding relative to the local share came to the attention of the state legislature. In 2007, the Colorado General Assembly passed and Governor Ritter approved SB 07-199 in order to address this problem. In relevant part, SB 07-199 amended the mill levy provisions of the School Finance Act in two ways. First, it altered subsection (III), the section incorporating article X, section 20 by reference, to give effect to the local school district waiver elections. Prior to SB 07-199, section 22-54-106(2)(a)(III) read:
The number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution. . . .
After SB 07-199 was enacted, it read:

For a district that has not obtained voter approval to retain and spend revenues in excess of the property tax revenue limitation imposed on the district by section 20 *526 of article X of the state constitution, the number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution.
§ 22-54-106(2)(a)(III), C.R.S. (2008) (emphasis added). Second, the legislature amended the mill levy provisions by adding a statewide limit of twenty-seven mills.
SB 07-199 recognized that school districts whose voters had approved broadly worded waiver elections were not subject to the subsection (7)(c) property tax revenue limit. In so doing, the legislature defined the local share of the School Finance Act joint funding in a way that implemented the local school district elections, stabilized mill levies and allowed local school districts to receive increased property tax revenues due to increased property values. For each school district that previously passed a broadly worded waiver election, the subsection (7)(c) property tax revenue limit was no longer applicable. Instead, one of the other limits of the School Finance Act, such as the previous year's mill levy or the newly added twenty-seven mill cap, became the operative limit.
SB 07-199 affected 148 of the 174 school districts that passed a broadly worded waiver election. In 115 of those school districts, the mill levy was frozen at the previous year's levy instead of decreasing, as it would have had under the CDE's prior application of the law.[5] In thirty school districts, mill levies were reduced to the twenty-seven mill levy cap. In twenty-nine school districts, mill levies were unaffected by the enactment of SB 07-199. SB 07-199 had no effect on the three school districts where no waiver election occurred or Steamboat Springs School District where a narrowly worded waiver occurred. Overall, no mill levy increased as a result of SB 07-199. Although the property tax rate was unaffected, SB 07-199 led to the collection at the local school district level of an additional $117,838,000.00 for fiscal year 2007-2008 by allowing school districts to retain revenue attributable to increased property values.
In December 2007, this case was brought by the Mesa County Board of County Commissioners,[6] Main Street Café, Evan Gluckman, Donald Shonkwiler, John Bozek, Sharon Johnson and Rick Nevin as representatives of similarly situated Colorado Taxpayers and Registered Voters (collectively "the plaintiffs") as a class action complaint. The plaintiffs sought declaratory and injunctive relief and a refund of the $117.8 million allegedly collected in violation of article X, section 20. The plaintiffs originally named the CDE as the sole defendant. The State of Colorado and Governor Ritter were later granted permission to intervene as defendants. After a four-day trial, the trial court declared SB 07-199 unconstitutional. This direct appeal followed.[7]

III. Analysis
This case represents the intersection of two complex laws: the School Finance Act and article X, section 20. As the trial court noted, "[u]ntangling the various provisions of [article X, section 20], especially as its provisions relate to calculation of limits on collection of revenue, voting requirements, and allocation of revenue among various school districts consistent with the School Finance Act, presents a difficult task indeed." In the present case, we are charged with harmonizing various provisions of article X, section 20, interpreting the School Finance Act, and determining the consequence of school district ballot measures.
*527 As an initial matter, the plaintiffs assert, and the trial court held, that the presumption of constitutionality and the beyond-a-reasonable-doubt standard necessary to overcome it do not apply in this case. The trial court instead found a different standard applicable in this case because article X, section 20, states that, "[i]ts preferred interpretation shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1). However, this tenet of construction is not a refutation of the beyond-a-reasonable-doubt standard, but rather an interpretive guideline a reviewing court may employ when it finds two separately plausible interpretations of the text of article X, section 20. A challenge to the constitutionality of a state statute cannot be resolved by relying on article X, section 20's tool of construction.
As we held in Barber v. Ritter, the presumption of constitutionality applies to a statute challenged under article X, section 20. 196 P.3d at 247-48. The beyond-a-reasonable-doubt showing necessary to overcome that presumption "acknowledges that declaring a statute unconstitutional is one of the gravest duties impressed upon the courts." City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial, 3 P.3d 427, 440 (Colo.2000). This presumption flows from the deference the court affords the legislature in its law making functions. A reviewing court must assume that the "legislative body intends the statutes it adopts to be compatible with constitutional standards." Meyer v. Lamm, 846 P.2d 862, 876 (Colo. 1993).
Article X, section 20 expressly acknowledges the dual nature of public school funding and the affirmative obligation of local school districts to meet the state mandated public school funding requirement in subsection (9).[8] However, it provides no guidance on how to apply its taxation and revenue requirements to such a dual funding system. Rather, it simply treats the state and each school district as a "district" and imposes its various requirements separately on each district. See Colo. Const. art. X, § 20(2)(b) (defining "district" as "the state or any local government").
Therefore, we must interpret article X, section 20 in light of our established precedent governing dual taxing authorities. That precedent recognizes that the taxing power is one of the legislature's core functions. "Subject to the fundamental or organic limitations on the power of the state . . . the legislature has plenary power, and is vested with a wide discretion, with respect to taxation." Pueblo Jr. College Dist. v. Donner, 154 Colo. 26, 31, 387 P.2d 727, 730 (1963). The General Assembly developed and implemented dual funding in several substantive areas as a result of the economic collapse of the Great Depression. See, e.g., Ch. 51 sec. 1, 1933 Colo. Sess. Laws 385 (establishing dual funding for public assistance programs); Ch. 145, sec. 1, 1933 Colo. Sess. Laws 764 (establishing dual funding for old age pensioners). Prior to that time, program funding in many areas had been largely left to local taxing authorities.
To successfully implement dual funding, the legislature was required to comply with several constitutional restrictions that remain in effect today. Among these is a constitutional prohibition against the state levying taxes for a purely local purpose, Colo. Const. art. X, § 7,[9] and a constitutional requirement of uniform taxation, Colo. Const. art. X, § 3.[10] Because many of these dual funding statutes were challenged in litigation, see, *528 e.g., Wilmore v. Annear, 100 Colo. 106, 65 P.2d 1433; Walker v. Bedford, 93 Colo. 400, 26 P.2d 1051 (1933), we have a well-established body of case law interpreting dual funded programs.
Our most recent and comprehensive case addressing a dual taxation system is Colorado Dep't of Soc. Services. v. Bd. of County Comm'rs of County of Pueblo, 697 P.2d 1 (Colo.1985) ("Colorado Social Services"). Colorado Social Services dealt with state/county jointly funded public assistance under the social services code. As relevant to this case, three principles came out of our holding in Colorado Social Services. First, a dual state/local funded program is constitutionally permitted if both the state and the local entity have an interest in the subject matter of the program. Id. at 12-13. Second, the state can require the local government to pay its statutorily mandated share under a dual funding formula. Id. at 17. Third, the local government is the relevant taxing authority for the local share of the dual funding program, even if the tax is levied under the direction of the state. Id. at 11-12.
Article X, section 20 neither changes these basic principles of our dual funding precedent nor imposes specific election requirements to retain excess revenue under a dual funding formula.[11] In fact, article X, section 20 expressly contemplates the state's separate constitutional obligation to provide a uniform system of free public schools throughout the state and acknowledges the state's ability to impose unfunded mandates on local districts to accomplish this goal in subsection (9). The principles discussed in Colorado Social Services continue to control the elements of a dual funding system.
As that case explains, the state itself cannot levy a local property tax, although the state can require the local government to pay its share of a dual funding system. From a constitutional perspective, local governments are responsible for imposing, collecting and expending local property taxes. Interpreting article X, section 20 consistently with that precedent establishes that districts are viewed as separate and distinct entities. The limits of article X, section 20 apply independently to each district. Therefore, we must determine if the requirements of article X, section 20 were violated at the state level, or if they were violated at the local school district level.[12] If SB 07-199 did not violate a specific provision of article X, section 20 as applied independently to each district, there is no constitutional violation.
In this case, the plaintiffs argue three requirements of article X, section 20 were violated: subsection (4)'s requirement for voter approval in advance for a "tax policy change directly causing a net tax revenue gain to any district," subsection (7)(c)'s voter approval requirement to remove the property tax revenue limit, and subsection (1)'s voter approval requirement to weaken an "other limit." The plaintiffs argue that SB 07-199 is unconstitutional because it violated all three of these advance voter approval requirements. Looking at each district independently, we find that SB 07-199 violates none of these limits and is therefore constitutional.

A. Subsection (4)(a)'s "tax policy change" language
The plaintiffs' first argument is centered on subsection (4), which is entitled "Required Elections" and provides a list of actions that trigger an election requirement. It reads in relevant part:
[D]istricts must have voter approval in advance for . . . any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change *529 directly causing a net tax revenue gain to any district.
Colo. Const. art. X, § 20(4)(a). The plaintiffs argue that SB 07-199 violated subsection (4)(a)'s language requiring advance voter approval of a "tax policy change directly causing a net tax revenue gain to any district." This requirement is an undefined "catch-all" phrase attempting to encompass any district action that is the equivalent of a new tax or a tax rate change that would not be covered by the more specific requirements listed before it. We find that the plaintiffs' reliance on subsection (4)(a)'s "tax policy change directly causing a net tax revenue gain" language is misplaced. The plaintiffs' argument would, in effect, require two elections to waive a revenue limit; one election to fulfill the subsection (7) revenue limit waiver, and another election for later legislation directing the use of the funds received as a result of that waiver. We find that argument without merit.
As an initial matter, we note that this language has never been interpreted by this court, so we aim to construe it in a way that provides some workable parameters. To this end, we find that to understand the language "tax policy change" in any real sense, it cannot be applied to any policy modifications that may have a de minimis impact on a district's revenues.[13] To apply the limit in such a broad manner would make any legislative action in the revenue arena nearly impossible and cripple the government's ability to function. In some cases, the cost of the election could exceed the additional revenue obtained, an absurd result that the voters could not have intended when they passed article X, section 20. We have consistently declined to adopt interpretations of article X, section 20 that would unreasonably curtail the everyday functions of government. See Havens v. Bd. Of County Comm'rs, 924 P.2d 517, 521 (Colo.1996); In re Submission of Interrogatories on House Bill 99-1325, 979 P.2d 549, 557 (Colo.1999).
Subsection (4)(a) must be read in conjunction with the other provisions of article X, section 20; specifically, the subsection (7) revenue limits. When read together, it becomes apparent that a "tax policy change directly causing a net tax revenue gain to any district" only requires advance voter approval when the gain exceeds one of the subsection (7) revenue limits. Otherwise, the inclusion of the specific revenue limits would be unnecessary and redundant. To find that any tax policy change resulting in a net tax revenue gain, even one that does not violate the subsection (7) revenue limits, requires voter approval would eliminate the need for those detailed revenue limits entirely. Such an interpretation would create internal inconsistency and effectively read subsection (7) out of article X, section 20. To avoid such a result, we find that a "tax policy change directly causing a net tax revenue gain" only requires voter approval when the revenue gain exceeds the limits dictated by subsection (7).
However, that does not indicate that subsection (4)(a) requires two elections in this case; i.e., one to waive a revenue limit and one to later direct use of the funds received as a result of that waiver. Here, the subsection (7)(c) revenue limit is at issue. As will be addressed later, the local school district elections validly waived that limit. We find that subsection (4)(a) does not require a second election, at either the local or state level, for legislation directing how revenue received as a result of a waiver election should be used.

i. No Second Election Required at Local Level
First, subsection (4)(a) does not require a second election at the local level. Such a requirement would create unnecessary redundancy. We have been "guided by a long standing rule of constitutional construction that provisions contained in this state's constitution are to be interpreted as a whole with effect given to every term contained therein." In re Interrogatories of the United States Dist. Ct. Pursuant to Rule 21.1, 642 P.2d 496, 497 (Colo.1982). We have routinely held that "[i]n discharging our judicial function, *530 we afford the language of constitutions and statutes their ordinary and common meaning. We ascertain and give effect to their intent." Bd. of County Comm'rs v. Vail Assocs., 19 P.3d 1263, 1273 (Colo.2001) (internal citations omitted). Article X, section 20 establishes a scheme of advance voter approval. The evident purpose of article X, section 20 is to "limit the discretion of governmental officials to take certain taxing, revenue and spending actions in the absence of voter approval." Havens v. Bd. of County Comm'rs of County of Archuleta, 924 P.2d 517, 522 (Colo.1996). Interpreting article X, section 20 in a way that harmonizes its various provisions while at the same time providing for voter approval in advance, we find that an additional election under subsection (4)(a) is not required before the enactment of legislation directing the use of the funds received as a result of a valid waiver of the applicable subsection (7) revenue limit.
This interpretation is in line with language contained in subsection (7)(d) that states, "[v]oter approved revenue changes do not require a tax rate change." This declaratory sentence provides that if a district conducts a valid revenue limit waiver, it need not also conduct a tax rate change election. Once a revenue limit is validly waived, it is unnecessary to require a second election for later legislation directing the use of the additional funds that a district received as a result of the waiver election. Such legislation is not a policy change, but an implementation of the waiver election. Therefore, subsection (4)(a) did not require an additional election at the local school district level.

ii. No Second Election Required at State Level
Second, SB 07-199 does not require an additional election at the state level. Article IX, section 15 of the Colorado Constitution requires local control of school districts.[14] This court has consistently found that "local control requires a school district to have discretion over any instruction paid for with locally-raised funds." Owens v. Colo. Cong. Of Parents, Teachers and Students, 92 P.3d 933, 939 (Colo.2004) (citing School Dist. No. 16 v. Union High School No. 1, 60 Colo. 292, 293, 152 P. 1149 (1915)). This accords with our dual-funding precedent establishing that legislation requiring local districts to provide a share of jointly funded programs does not amount to the imposition or levy of a tax on those districts by the state. As long as the local share of the jointly funded program is applied solely to spending within the district and the local district retains substantial control over the expenditure of those funds, the local district remains the taxing entity. See Colorado Social Services, 697 P.2d at 11-12. In this case, the excess revenue is generated at the local district level, and is paid by local property taxpayers. It is not generated at the state level and does not implicate state taxpayers. Although under the School Finance Act the state dictates the overall scheme of school funding and the county performs the ministerial function of collecting taxes levied by the school district, the school district remains the relevant taxing authority. As such, the school district is the only "district" with the authority to change tax policy within the meaning of article X, section 20. The state cannot cause a "tax policy change" at the local district level. Therefore, the language of subsection (4)(a) does not require an additional vote at the state level.
The Attorney General argues otherwise, relying on the language of subsection (4)(a) requiring voter approval in advance if a tax policy change will cause "a net tax revenue gain to any district." Colo. Const. art. X, § 20(4)(a) (emphasis added). Recognizing that SB 07-199 was enacted at the state level and there was no actual net revenue gain to the state, the Attorney General maintains that a statewide election was required because SB 07-199 resulted in a net revenue gain to "any" district, i.e., the local school districts that had received prior approval *531 from their voters were permitted to collect and expend more revenue. The Attorney General concludes that if subsection (4)(a) intended to limit a statewide vote to only those policy changes affecting a net gain in state tax revenues, subsection (4)(a) would have referenced "a" district rather than "any" district. Alternatively, he argues that by decreasing the amount it pays under the School Finance Act formula, the state effectively received a net revenue gain.
Neither argument is persuasive. First, the textual argument distinguishing between "a" and "any" is untenable. Nothing in subsection (4)(a) indicates that the terms were used so precisely. The difference between the two words is far too subtle to be the basis for restricting the powers of the state legislature and imposing on the state the costs of statewide elections. This conclusion is reinforced by the use of the word "any" in the definition of "district" as including "the state and any local government," Colo. Const. art. X, § 20(2)(b) (emphasis added). The word "any" is used in an identical manner as the word "a" would be. Second, we decline to expand the net revenue gain provision to include an "effective" net revenue gain. There would be no logical limit to such an expansion, and it would require us to read language into the constitutional provision that does not appear there.
The provision of SB 07-199 at issue in this case, which affects the applicability of the property tax revenue limit as it is referenced in section 22-54-106(2)(a)(III), is specifically limited to those districts that passed a broadly worded waiver election.[15] SB 07-199 does not eliminate the revenue limit, but rather recognizes that the limit was previously waived by voters in the local school districts, which are the relevant districts for purposes of any article X, section 20 limit. As the Governor argues, any "change" occurred when the school districts voted, not when SB 07-199 was enacted. Later legislation directing the use of revenue received as a result of the waiver election does not require an additional election.
Therefore, we find that the subsection (4)(a) language is not applicable to this case and SB 07-199 did not unconstitutionally cause a "tax policy change directly causing a net tax revenue gain to any district" without prior voter approval. The plaintiffs have not proved that SB 07-199 violated a constitutional provision.

B. Subsection (7)(c)'s Property Tax Revenue Limit
Having found that SB 07-199 does not require a second election under subsection (4)(a) if the relevant revenue limit was validly waived, we now turn to whether the local school district waiver elections fulfilled the election requirements of subsection (7). The plaintiffs assert that SB 07-199 violated the property tax revenue limit imposed by subsection (7)(c) without advance voter approval. First, they argue the local school district elections do not constitute the required voter approval because there is nothing in any of those waiver elections informing voters that a "yes" vote could cause an increase in property taxes or impact the property tax revenue limit of subsection (7)(c). Second, the plaintiffs contend that voter intent at the waiver elections establishes that property tax revenues were not intended to be included in the waiver. Third, they argue that the CDE's subsequent interpretationthat the School Finance Act required the maintenance of subsection (7)(c)'s revenue limitestablishes that the waiver elections did not provide proper authorization for SB 07-199.
We find none of the plaintiffs' arguments overcomes the presumption of constitutionality. First, although the plaintiffs assert that the local school district waiver elections do not satisfy the voter approval in advance requirements of subsection (7)(c), nothing in that section imposes specific requirements on the form or content of voter approval. Subsection (7)(c) simply requires that there be voter approval in advance. Second, the plaintiffs' reliance on voter intent cannot overcome the straightforward language of the ballot issues authorizing the waiver of all revenue limits imposed by article X, section *532 20. Third, the argument that the CDE's subsequent maintenance of the limit establishes that the limit was not waived by the elections fails to realize that the CDE's interpretation cannot supersede the General Assembly's legislation. We will now address each argument individually.

i. Waiver Election Language Requirements
The plaintiffs first assert that the local school district waiver elections do not constitute the required advance voter approval because they provided no notice to voters that a "yes" vote could impact their property taxes. They insist that because the waiver elections did not specifically reference the property tax revenue limit, that limit was not waived. As noted, 174 of the 178 school districts in Colorado held successful, broadly worded waiver elections. The ballot measures at issue in these elections referred to collecting and expending "all revenues" or "full revenues" from whatever source, notwithstanding the limitations of article X, section 20. The scope of these waivers was unlimited as to the source of the revenue.
The district court agreed with the plaintiffs and found that the language of subsections (7)(c) and (d) established that changes in revenue and changes in property tax revenue must be treated differently. The court then held that the waiver elections at issue only met the requirements for revenue in general, and not property tax revenue. In essence, the court read into subsection (7)(c) specific voter approval language requirements for removing the property tax revenue limitation, and found that the local school district waiver elections did not meet those requirements. In reaching this conclusion, the court incorrectly interpreted the constitution and failed to give full force and effect to the waiver elections.
Subsection (7)(c) simply states that the property tax revenue limit can only be adjusted by "revenue changes approved by the voters" without specifying any particulars about what kind of voter approval in advance is required. Applying the constitutional language by its clear terms, we determine that there are no specific voter approval language requirements in subsection (7). The only specific ballot language requirements of article X, section 20 are contained in subsection (3),[16] which is not at issue in this case. The inclusion of such specific ballot language elsewhere, however, points to the fact that the drafters could have included specific ballot language in this type of situation if they had chosen to do so. In the absence of any such language requirement, a district has the discretion to fashion an appropriate ballot question.
With this understanding, we find our precedent established in Havens applicable. In Havens, we held that subsection (7)(d) mandates one of two outcomes when one of the limits established in sub-subsections (a) through (c) is exceeded. 924 P.2d at 523-24. "Either the excess revenues are to be refunded or they may be retained and expended if the voters so approve." Id. Havens concerned a revenue waiver election held by Archuleta County containing language very similar to the waiver elections at issue in this case. We held that such wording in a revenue limit waiver "clearly provides that the County may retain and expend the excess revenues it collects." Id. at 522. We did not require specific ballot language.
In the case now before us, we again find that a broadly worded, voter-approved waiver of revenue limits, authorizing school districts to collect and retain all revenues notwithstanding the limitations of article X, section 20, does just that, with no restrictions or language requirements. In each of the 174 districts, voters waived all revenue *533 limitations imposed by article X, section 20, and we will respect the General Assembly's interpretation that these elections provided the authority to implement SB 07-199 "in the absence of clear provisions to the contrary." Id.
The plaintiffs assert that our precedent established in Bickel v. City of Boulder, 885 P.2d 215 (Colo.1994), and Bolt v. Arapahoe County School District No. 6, 898 P.2d 525 (Colo.1995), requires that any voter approval in advance must involve approval of the specific tax policy change that is causing the net tax revenue gain. This is a misinterpretation of those holdings.
Bickel and Bolt both dealt with mill levy increases, not the removal of a revenue limit, which is at issue here. In Bolt, we stated that article X, section 20, subsection (4) only requires voter approval for "those taxes which are either new or represent increases from the previous year." Bolt, 898 P.2d at 534. In this case, there is neither a new tax nor a tax rate increase at issue, but the removal of a revenue limit. Moreover, we held in Bickel that even in the context of the specific ballot language requirements of subsection (3)requirements that are not at issue in this casea "substantial compliance" standard should be used to review claims brought to enforce article X, section 20's election provisions. Bickel, 885 P.2d at 227. As relevant here, those cases merely establish that a "substantial compliance" standard applies to article X, section 20 voting requirements.
Because there are no specific language requirements for this type of waiver election, the individual school district waiver elections that reference "all" or "full" revenues substantially comply with the general requirements of subsection (7). "In examining the plain language, we do not `read a statute to create an exception that the plain language does not suggest, warrant, or mandate.'" Bruce v. City of Colorado Springs, 129 P.3d 988, 993 (Colo.2006) (quoting Town of Telluride v. Lot Thirty-Four Venture, L.L.C., 3 P.3d 30, 35 (Colo.2000)). Therefore, the plaintiffs failed to prove that the waiver elections at issue violated a constitutional provision.

ii. Applying the Straightforward Ballot Language
The plaintiffs next argue that even if no specific ballot language was required to waive the subsection (7)(c) revenue limitation, voter intent in those elections demonstrates that the property tax revenue limit was not waived. We reject this argument. The district court incorrectly utilized evidence such as election notice language to determine voter intent. This extrinsic evidence is irrelevant to our inquiry; outside evidence cannot contradict and override the text of the ballot question.
The scope of the waiver is determined by the straightforward text of the ballot issues themselves, and not by what the plaintiffs insist was the actual intent of the voters. "[Ballot measures] are not subject to the same drafting processes as statutes. Nonetheless, we apply generally accepted principles, such as according words their plain or common meaning." Id. Voters in this case evaluated ballot questions containing unambiguous terms such as "all" or "full." The straightforward wording of the ballot questions governs our analysis of whether they fulfilled the substantial compliance requirements. Unless the language is ambiguous, we give effect to the plain language of the ballot question. See generally In re Title, Ballot Title, Submission Clause, and Summary for 2005-2006 No. 75, 138 P.3d 267 (Colo.2006).
Moreover, although irrelevant to our inquiry, we note that most of the evidence offered on voter intent came from individuals who participated in the drafting of the ballot questions at issue or were otherwise interested in the election. This court has held that when interpreting constitutional amendments adopted by ballot initiatives, "any intent of the proponents that is not adequately expressed in the language of the measure will not govern the court's construction of the amendment." In re Interrogatories Relating to the Great Outdoors Colo. Trust Fund, 913 P.2d 533, 540 (Colo.1996). The same reasoning holds true for the constitutional revenue limit waiver elections at issue here. "The *534 intent of the drafters, not expressed in the language of [the ballot initiative], is not relevant to our inquiry." Davidson v. Sandstrom, 83 P.3d 648, 655 (Colo.2004). The straightforward language of the ballot questions was what was in front of the voters at the waiver elections, and we will apply that language.
Reliance on the ballot language is especially important for these ballot issues because article X, section 20 relies on voters to make important financial decisions. The issues are often complex, as they are in this case, and article X, section 20 provides minimal guidance to taxing authorities seeking voter approval. To make this form of "direct democracy" work, districts must be able to rely on the language of the ballot issues. It strains credulity to argue that references to "all revenues" or "full revenues" did not include property tax revenues when the ballot measures only applied to school districts and it is common knowledge that the great majority of local funding for schools comes from property tax revenues.[17] It seems logical to assume that voters who waived the limits on all revenues understood it to apply to the greatest portion of those revenues, property taxes, and not simply peripheral funding sources.
The record shows that school districts found themselves facing the revenue limits shortly after article X, section 20 became effective. The ultimate consequences of those limits may have been unknown, but the school districts deliberately undertook broad based waiver elections to eliminate all revenue limits that were currently and could possibly affect them in the future. SB 07-199 gave full force and effect to these expansive waivers, and applied them to the subsection (7)(c) limit.
Our conclusion is supported by the plaintiffs' argument itself. Insisting that property taxes were not intended to be affected as a result of the various waiver elections, the plaintiffs cite assorted pro-statements from the elections and offer testimony from individual voters. However, even though irrelevant, this evidence shows only that the voters did not intend to raise property tax rates.
For example, the Poudre School District pro-statement expressed that the waiver election was aimed at allowing "the school district to collect, keep and spend funds received from existing sources and existing taxes." That is exactly what happened in Poudre School District. The property tax at issue was an existing tax. The waiver election removed the subsection (7)(c) limit requiring mill levies to be reduced if property tax revenues exceeded the revenue limits imposed by article X, section 20. The only reason that property tax revenues increased in certain areas after those waivers were applied was because property values in those districts increased, not because new taxes were established or tax rates increased. In essence, it is similar to an individual's income tax liability where the amount of taxes owed may increase or decrease because the taxpayer's income increases or decreases. Such a fluctuation in one's tax liability could not reasonably be considered a tax rate change. Similarly, an increase or decrease in property tax liability due to fluctuations in the value of the underlying property is not a tax rate change. Rather, the waiver of the revenue limit defined in subsection (7)(c), a change that is specifically allowed by subsection (7)(d) ("Voter-approved revenue changes do not require a tax rate change"), is at issue.
What the plaintiffs fail to appreciate is that property taxes were not increased as a result of SB 07-199. SB 07-199 did not establish a new tax or increase tax rates; it maintained some existing rates when they otherwise would have decreased and actually reduced others that fell under the newly imposed twenty-seven mill limit. SB 07-199 simply applied these broad based waivers passed by school districts according to their language and we find that none of plaintiff's assertions establish that a constitutional provision was violated in doing so.

*535 iii. Subsequent Maintenance of Revenue Limit Not Controlling
The plaintiffs next contend that the maintenance of the growth-plus-inflation limit of subsection (7)(c) after a school district passed a successful waiver election establishes that the property tax revenue limit was not implicated by those elections. In other words, they question why the removal of the property tax revenue limit required the proactive passage of SB 07-199, while the limits on other revenue streams were immediately lifted by the waiver elections.
As previously detailed, SB 07-199 did not remove the property tax revenue limit, and therefore did not need voter approval itself. The waiver elections were effective immediately and gave the school districts, which are the relevant taxing authorities, the right to receive property tax revenue above the subsection (7)(c) limit. However, this result was not implemented because of the manner in which the CDE administered the School Finance Act. Rather than recognizing that all limits had been waived immediately after each successful election occurred, the CDE continued to advise school districts to certify mill levies in accordance with the property tax revenue limit of subsection (7)(c), and to reduce their mill levies when property tax revenues rose faster than the revenue limits permitted.
Eventually, the erosion of the local share of public school funding came to the legislature's attention. To rectify the situation, the legislature amended the School Finance Act. That amendment, SB 07-199, provided the CDE with clear statutory direction to allow school districts to implement the earlier elections and retain property tax revenue above the waived revenue limit.
There were no time limits included in the waiver elections that would bar the General Assembly from acting at a later date. The voters in 174 of 178 school districts approved ballot language allowing their school districts to retain and spend all revenues, notwithstanding the limitations of article X, section 20. Although the full effect of these waivers was not realized immediately, the delay does not undercut the validity of SB 07-199. The fact that the CDE and the local school districts continued to reference the waived property tax revenue limit when setting mill levies does not give rise to any rights that were violated by the enactment of SB 07-199. The delay in implementing the waiver elections may have caused harm to the state, or to the school districts, but it caused no harm to property taxpayers like those who brought this suit. If anything, the delay benefited local property taxpayers and harmed state taxpayers.
Therefore, we find that SB 07-199 did not unconstitutionally violate the subsection (7)(c) property tax revenue limit. Once again, the plaintiffs failed to prove that SB 07-199 violated a constitutional provision.

C. Subsection (1)'s "Other Limit" Language
The plaintiffs' third argument centers on the "other limit" language of article X, section 20. Subsection (1) states, "[o]ther limits on district revenue, spending, and debt may be weakened only by future voter approval." The plaintiffs assert that SB 07-199 weakened an "other limit," specifically a limit created by the School Finance Act, and therefore required explicit voter approval. We find this argument has no merit because the "other limit" language is inapplicable in this case.
As previously discussed, the 1993 School Finance Act incorporated by reference the property tax revenue limit and each district's corresponding ability to waive that limit. In other words, there is a specified limit at issue in this case, the limit created by subsection (7)(c). The "limit" imposed by the School Finance Act was nothing but a reference to the subsection (7)(c) limit, not an "other limit." Interpreting the School Finance Act as creating an independent limit would create unnecessary redundancy, or would amount to treating a reflection in a mirror to be a real object. We have routinely held that "[i]n discharging our judicial function, we afford the language of constitutions and statutes their ordinary and common meaning. We ascertain and give effect to their intent." Bd. of County Comm'rs v. Vail Assocs., 19 P.3d 1263, 1273 (Colo.2001). To find that the *536 School Finance Act creates a separate and distinct limit outside of the article X, section 20 limit it specifically references would be contrary to this requirement. Therefore, we decline to find that the "other limit" language of subsection (1) is implicated in this case.

IV. Conclusion
We conclude that SB 07-199 was a constitutional application of article X, section 20 to the School Finance Act. The plaintiffs failed to prove it unconstitutional beyond a reasonable doubt. Subsection (4)(a) does not require a second election for legislation directing a local school district to use funds received as a result of a valid waiver election under subsection (7). Article X, section 20 does not expressly address the situation raised by the dual funding nature of the School Finance Act except to prohibit local school districts from refusing to pay their mandated share of funding. The school districts remained the relevant taxing authority for purposes of the locally raised revenue, and a statewide vote is not required to waive a revenue limit at the local level.
Moreover, the local school district elections validly waived the revenue limit at issue in this case. Article X, section 20 established no specific ballot title requirements to waive a revenue limit. The local school district waiver elections were broadly worded and unlimited in scope. The ballot language at issue in the various elections was clear and unambiguous. It referenced all revenues from whatever sources, notwithstanding the limitations of article X, section 20. Local property taxes are the main source of local revenue for school districts and fall within a description of all revenues. SB 07-199 does not establish a new tax or increase tax rates. Rather, it allows the public school funding system to capture increased property tax revenues resulting from increased property values.
We find that there is ample evidence and authority to find SB 07-199 constitutional, and conclude that the plaintiffs failed to show it violated a constitutional provision. The judgment of the district court is reversed and the case is remanded to that court with directions to enter judgment for the defendants.
Justice COATS concurs in part and in the judgment.
Justice EID dissents.
Justice COATS, concurring in part and in the judgment.
I agree with the majority that SB 07-199 does not, and could not constitutionally, grant the state the authority to directly impose a tax on local school districts or change their taxing or spending policy in any way. Similarly, I agree that by allocating a greater share of educational funding to local school districts, the state has neither changed its own tax policy nor weakened any state revenue, spending, or debt limit in violation of article X, section 20 of the state constitution. That being the case, however, the plaintiffs' suit against the state fails, without regard to the scope or validity of any attempt by individual school districts to waive constitutional limitations.
Should an appropriate challenge to the spending practices of a particular school district arise, the question of waiver may then become relevant. While I can appreciate the majority's concern for economy and its desire to provide budgetary guidance, I am reluctant (in the absence of such an actual case or controversy) to opine generally whether or under what circumstances the Taxpayer's Bill of Rights (TABOR) may permit the waiver of its spending or revenue limits. This is especially the case since TABOR makes separate provision for the funding of public education.
In light of the majority's lengthy discussion of voter-approved waivers of subsection (7) limitations, I feel compelled to emphasize that subsection (9) of this constitutional provision addresses the matter of subsidies, or unfunded mandates, delegated to local districts by the General Assembly. With regard to all other state-mandated subsidies for joint programs, a local district may choose to truncate its spending (rather than seek voter approval for an otherwise necessary revenue change), by reducing or even terminating its state-mandated obligation. *537 With regard to a local school district's state-mandated share of funding for public education through grade 12, however, this option is expressly made unavailable, leaving the local district legally obligated to comply, regardless of its wishes.
Unlike the majority, I understand this provision as a clear recognition that statutorily mandated subsidies for joint state-local programs are not the equivalent of state-imposed taxes, as well as a clear indication that they are not to be excluded from the calculation of local district spending. Because local school districts are prohibited by subsection (9) from reducing their state-mandated share of funding for public education through grade 12, without regard to constitutional limitations on district spending, it would, however, be quite contradictory to construe TABOR as requiring voter approval for the district to comply. Like other expenditures over which a local district has no control, such as the payment of final court judgments, see Colo. Const. art. X, § 20(1), I believe a local district's state-mandated share of educational funding that exceeded its spending limits would necessarily be exempt from the requirements of subsections (4)(a) and (7).
As the majority notes, the state has separate constitutional obligations regarding the provision of a uniform system of public education, which have resulted in the shared funding mechanism of the School Finance Act. I believe that with the inclusion of subsection (9), the Taxpayer's Bill of Rights amendment takes account of those obligations and makes clear that it cannot become an excuse for local school districts to default on their state-mandated share. Whether or not the funding mechanism chosen by SB 07-199 runs afoul of the state's constitutional obligations in other ways, the majority adequately demonstrates that it cannot violate article X, section 20 of the state constitution.
Although I would not address either the validity or scope of the various attempts by local school districts to waive local spending or revenue limits, I concur in the remainder of the majority opinion and the judgment of the court.
Justice EID, dissenting.
Today the majority holds that SB 07-199which in effect authorizes a $117 million tax increase on Colorado taxpayerscomplies with article X, section 20 of the Colorado Constitution, even though the voters never approved it. The majority's rationale for its decisionnamely, that SB 07-199 is simply not covered by article X, section 20is, in my view, utterly unconvincing. In order to reach this result, the majority discovers that a gaping hole exists in article X, section 20a hole so big that, according to the majority, SB 07-199 falls right through it. Yet it is undisputed in this case that, prior to SB 07-199, state law prevented local school districts from keeping the $117 million in excess revenues that they had collected after conducting waiver elections. It is similarly undisputed that SB 07-199 removed that provision of state law and allowed the districts to keep those funds. SB 07-199 is thus a "tax policy change directly causing a net tax revenue gain to any district" under the plain language of article X, section 20, and requires a vote of the people. Colo. Const. Art. X, § 20(4)(a). There has never been (and under the majority's opinion today, never will be) a vote of the people authorizing this change in state tax policy. Because the majority deprives the people of their right to vote on SB 07-199 and the $117 million tax increase it permits, I must respectfully dissent from its opinion.
Under article X, section 20, "[D]istricts must have voter approval in advance for . . . a tax policy change directly causing a net tax revenue gain to any district." Colo. Const. Art. X, § 20(4)(a) (emphasis added). Prior to the passage of SB 07-199, the School Finance Act required school districts to abide by article X, section 20's revenue limitations. See § 22-54-106(2)(c), C.R.S. (1994) (capping mill levies at "[t]he number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by [article X, section 20]") (emphasis added); maj. op. at 525. SB 07-199 removed the School Finance Act's requirement that school districts abide by article X, section 20 and permitted districts to retain more revenue than article X, section 20's limitations would allow. § 22-54-106(2)(a)(III), C.R.S. *538 (2008) (providing that article X, section 20's limitations apply only to "a district that has not obtained voter approval to retain and spend revenues in excess of the property tax revenue limitation imposed on the district by [article X, section 20]"); maj. op. at 525. The bottom line is that, prior to SB 07-199, state law prevented districts from keeping the $117 million in excess revenues that they had obtained through local waiver elections. SB 07-199 authorized them to keep the money. SB 07-199 is thus a "tax policy change directly causing a net tax revenue gain to any district" under article X, section 20(4)(a)plain and simple.
Should there be any doubt about this point, one need only turn to the testimony of Colorado State Treasurer Cary Kennedy who, in response to questioning by the district court below, acknowledged that SB 07-199 was a state tax policy change. Treasurer Kennedy was asked:
In your view, did Senate Bill 199 alter the effect of how mill levies are calculated for a taxpayer in the State of Colorado?
Treasurer Kennedy answered:
It altered the policy, yes.
In my view, Treasurer Kennedy is entirely correct on this point. Subsection (4)(a)in plain, straightforward, and unambiguous languagerequires "voter approval in advance" for such a "tax policy change."[1]
The majority comes to the contrary conclusion, finding that a vote of the people is not required because SB 07-199 isn't a "tax policy change directly causing a net tax revenue gain to any district" under subsection (4)(a) in the first place. The majority holds that subsection (4)(a)'s voter approval requirement applies to only those tax policy changes that result in revenue gains that "exceed[] one of the subsection (7) revenue limits." Maj. op. at 529. Apparently, the majority believes that because SB 07-199 allowed the local school districts, rather than the state, to exceed revenue limitations, it cannot be covered by subsection (4)(a). See, e.g., id. at 530-31.
The answer to the majority's argument is simple: the language of subsection (4)(a) is not so limited. Subsection (4)(a) requires that "districts must have voter approval in advance for . . . a tax policy change directly causing a net tax revenue gain to any district." (emphasis added.) As applied in this case, the language requires that the "distric[t] [here, the state] must have voter approval in advance for . . . a tax policy change [here, SB 07-199] directly causing a net tax revenue gain [here, the $117 million] to any district [here, the local school districts]." The majority creates a loophole through which SB 07-199 slips, but the plain language of subsection (4)(a) is loophole-free.[2]
The majority claims such a loophole is necessary because the language of subsection (4)(a) could not really mean what it says. The majority reasons that if the language actually meant what it saysthat is, if the state had to obtain voter approval for all tax policy changes directly causing revenue gainsvoter approval would be required even for de minimis revenue gains. Maj. op. at 529. This argument is a red herring. The amount of tax revenue involved in this case$117 millionis hardly de minimis. In my view, it is wrong for the majority to deprive the voters of their right to vote on a decidedly non-de minimis tax increase simply because it can imagine an "absurd" application of the voter approval requirement. Id.
The majority also argues that voter approval is not required for SB 07-199 because the legislation did not change state tax policyit *539 simply "implemented" the waiver elections conducted by the local school districts. The majority can call SB 07-199 anything it wants: a "reflect[ion]" of the fact that various local school districts had conducted elections to waive the revenue limitation of subsection (7), maj. op. at 523; a "recogni[tion]" of those elections, id. at 526; an "implement[ation]" of those elections, id.; a "stabiliz[ation]" of mill levies, id.; a legislative "direct[ion]" regarding "the use of the funds" received as a result of the waiver elections, id. at 529-30; or "clear statutory direction" to the Colorado Department of Education "to allow school districts to implement the earlier elections and retain property tax revenue above the waived revenue limit." Id. at 525. Whatever label is affixed, the result is the same: SB 07-199 enacted a change in state tax policy, and therefore voter approval was required under subsection (4)(a). No election has ever been heldstatewide or otherwiseasking the voters to approve SB 07-199. The legislation is therefore contrary to article X, section 20.
The majority points out that SB 07-199 is presumed to be constitutional. Maj. op. at 523-24; 527. The majority is of course correct that courts must not lightly set aside statutes passed by the General Assembly as unconstitutional. See Town of Telluride v. San Miguel Valley Corp., 185 P.3d 161, 172-73 (Colo.2008) (Eid, J., dissenting). I have two major concerns, however, about the majority's application of the presumption of constitutionality in this case. First, the presumption of constitutionality cannot save a constitutional interpretation that is flatly wrong, which I believe the majority's to be. Second, and more importantly, I fear that the highly deferential approach articulated by the majority today may apply, at least in practice, only to interpretations of article X, section 20. Maj. op. at 523, 527 (relying on Barber v. Ritter, 196 P.3d 238 (Colo.2008), which held that transfers from cash funds to the general fund do not violate article X, section 20). In my view, the presumption of constitutionality cannot be used as a cover to excise article X, section 20 from our Constitution. The wisdom of that constitutional provision is a question for the voters, not this court, to decide.
After concluding that SB 07-199 does not constitute a "tax policy change" requiring voter approval, the majority candidly engages in judicial overreaching by considering whether the individual elections held by the local school districts satisfied the requirements of subsection (7)(c) to waive property tax revenue limitations. Maj. op. at 531-35. The majority forthrightly admits that the plaintiffs in this case "did not sue any of the school districts" alleging that their individual waiver elections were insufficient. Id. at 529 n. 13. And in fact, the plaintiffs' complaint in this case is clearly limited to challenging SB 07-199 under article X, section 20, and is brought against state entities only. The majority further acknowledges that "[o]rdinarily this defect would prevent us from determining the validity of the missing defendants' actions." Id. Yet the majority plows ahead to consider the validity of hypothetical claims that the plaintiffs could in the future bring against hypothetical defendant school districts, just in case the plaintiffs had the inclination to do so after today's decision rejecting the claim they did in fact bring.
The majority justifies its consideration of these hypothetical claims "because of the public importance of the School Finance Act" and because "the issues have been fully briefed." Id. Yet these hypothetical claims have not been "fully briefed;" indeed, they haven't even been brought. The defendants in this case did raise an alternative argument-namely, that if this court were to find that SB 07-199 was a tax policy change requiring voter approval, the local school district waiver elections satisfied that voter approval requirement. But the majority does not address this alternative argument, instead opting to consider the conduct at the state and local level as distinct inquiries. Id. While I would find the defendants' alternative argument unpersuasive,[3] I find the majority's *540 consideration (and rejection) of the plaintiffs' hypothetical claims deeply troubling for an altogether different reason. In my view, such consideration demonstrates the lengths to which the majority will go to ensure that no vote of the people ever be required with regard to issues surrounding this case.
In the end, if the majority were truly correct in its ultimate conclusion that the local waiver elections were sufficient to waive subsection (7) revenue limitations, maj. op. at 531-35, one must wonder why SB 07-199 was necessary in the first place. Indeed, under the majority's interpretation, the school districts should have simply kept the money once the local school district waivers were in place. See, e.g., maj. op. at 535 ("The waiver elections were effective immediately and gave the school districts, which are the relevant taxing authorities, the right to receive property tax revenue above the subsection (7)(c) limit."). The majority attempts to explain the districts' actions by blaming the Colorado Department of Education, which continued to calculate the districts' portion of education funding under the limitations even after the waiver elections had taken place. Id. at 535. According to the majority, the General Assembly passed SB 07-199 to give the Department "clear statutory direction to allow school districts to implement the earlier elections and retain property tax revenue above the waived revenue limit." Id.
The majority may very well be correct about the General Assembly's motivation for passing SB 07-199. The point, however, is irrelevant. SB 07-199's "clear statutory direction" to the Department to allow the local school districts to keep the excess revenue was, as developed above, a change in state tax policythat is, the removal of the School Finance Act's requirement that school districts abide by the revenue limitations imposed by article X, section 20. To put it somewhat differently, the Department continued to calculate the districts' portion of education funding according to the limitations imposed by article X, section 20 even after the waiver elections took place because the School Finance Act required it to do so. It could not remove those limitations until the General Assembly enacted, with voter approval, the state tax policy change contained in SB 07-199.
The purpose of article X, section 20 "is to require that the voters decide for themselves the necessity for the imposition of new tax burdens." Submission of Interrogatories on SB 93-74, 852 P.2d 1, 4 (Colo.1993). Today the majority deprives the voters of this opportunity regarding SB 07-199. I therefore respectfully dissent.
NOTES
[1] These statutory limits were slightly changed in 1994. For the purposes of this case, the changes between 1993 and 1994 are inconsequential. This section of the School Finance Act did not substantively change after 1994 until the passage of SB 07-199 in 2006.
[2] In the context of article X, section 20, a "spending limit" creates an effective cap on revenues because the definition of spending includes "all district expenditures and reserve increases." Colo. Const. art. X, § (2)(e). In other words, the definition of spending includes savings or increases in reserve accounts.
[3] Only the Steamboat Springs (Routt County) School District passed a ballot measure that contained more limited language allowing the school district to retain only revenues other than property tax revenue. Therefore, for the remainder of this opinion we will be referring to the other 174 districts that conducted broadly worded waiver elections.
[4] Mill levies ranged from between two mills and thirty-eight mills before SB 07-199 was enacted, according to CDE statistics.
[5] Because this effect occurred in the majority of school districts, SB 07-199 was said to have enacted a "mill levy freeze."
[6] Although no party has raised the issue, we note the precedent of this court states that a county and its board of commissioners "have neither standing nor legal authority" to challenge the constitutionality of a state statute. Bd. of County Comm'rs of Dolores County v. Love, 172 Colo. 121, 125, 470 P.2d 861, 862 (1970); see also Romer v. Fountain Sanitation Dist., 898 P.2d 37, 40 (Colo. 1995). Nonetheless, because the other plaintiffs in this case have standing as taxpayers, see Barber v. Ritter, 196 P.3d 238, 245-47 (Colo. 2008), we will decide the case on the merits.
[7] This case came directly to this court because the court of appeals does not have jurisdiction to hear cases wherein a statute was declared unconstitutional. § 13-4-102(1)(b), C.R.S. (2008).
[8] Subsection (9) states in relevant part:

Except for public education through grade 12 or as required of a local district by federal law, a local district may reduce or end its subsidy to any program delegated to it by the general assembly for administration.
Colo. Const. art. X, § 20(9).
[9] Article X, section 7 of the Colorado Constitution states:

The general assembly shall not impose taxes for the purposes of any county, city, town, or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation.
[10] Article X, section 3 of the Colorado Constitution states in relevant part:

Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax.
[11] Although article X, section 20 never uses the term "taxing authority," it is clear that, for purposes of the revenue limitations of section (7), a "district" is a "taxing authority."
[12] The plaintiffs did not sue any of the school districts in this case. Ordinarily this defect would prevent us from determining the validity of the missing defendants' actions. However, because of the public importance of the School Finance Act and recognizing that the issues have been fully briefed, we elect to decide the validity of the school district waiver elections under article X, section 20.
[13] This is not to say that the additional revenue generated in this case is a de minimis amount, but rather to provide a workable definition for this constitutional language.
[14] Article IX, section 15 states:

The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts.
Colo. Const. art. IX, sec. 15.
[15] The parties do not challenge the propriety of excluding districts that did not conduct waiver elections, and we offer no opinion on that matter.
[16] For example, section (3)(b) provides specific language for ballot titles for elections falling under its provisions. Specifically, it states:

Titles shall have this order of preference:
"NOTICE OF ELECTION TO INCREASE TAXES/TO INCREASE DEBT/ON A CITIZEN PETITION/ON A REFERRED MEASURE."
Colo. Const. art. X, § 20(3)(b). And later:
Ballot titles for tax or bonded debt increases shall begin, "SHALL (DISTRICT) TAXES BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY . . ." or "SHALL (DISTRICT) DEBT BE INCREASED (principal amount), WITH A REPAYMENT COST OF (maximum total district cost) . . . ."
Colo. Const. art. X, § 20(3)(c).
[17] By way of example, the fact that the majority of a local school district's share of public school funding came from local property tax revenues was clearly evident in the "Analysis of 1992 Ballot Proposals" that was sent to voters before article X, section 20 was added to the constitution. Legislative Council of the Colorado General Assembly, An Analysis of 1992 Ballot Proposals, 6-12 (1992).
[1] Treasurer Kennedy took the further position that the waiver elections held by local school districts constituted the requisite voter approval for SB 07-199a position with which I disagree, as discussed below.
[2] The majority opinion also includes a lengthy discussion of our caselaw interpreting dual funding systems. Maj. op. at 527-28. The majority seems to attach significance to the fact that the local school districts, not the state, actually collected the tax revenue in this case. See, e.g., id. at 530-31; see also conc. op. at 536-37 (Coats, J.). The fact that the state in this case does not collect the tax revenue is irrelevant. Under the plain language of subsection (4)(a), the "district" making the tax policy changehere, the statemust obtain voter approval for its tax policy change, regardless of whether it takes in the tax revenue or not.
[3] The local school district waiver elections do not satisfy the requirement that SB 07-199 obtain voter approval in this case for variety of reasons. First, as noted, supra note 2, subsection (4)(a) requires the "district" making the policy change (here, the state) to obtain voter approval, and there has been no statewide vote on SB 07-199. Second, such an argument ignores the fact that the local school districts occupy a subordinate position vis-à-vis the state. Local school districts have no authority to hold elections that would approve a statewide change in the law such as SB 07-199; in other words, local districts cannot change state law. And finally, even if approval of a state tax policy change by the local districts were possible, which it is not, the local elections held in this case were insufficient to approve SB 07-199 because those elections did not seek approval of a change in the School Finance Act, and indeed were held long before SB 07-199 was even proposed.