Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 24, 2021

## 2021 CO 34

**No. 21SA97, *In re: Interrogatory on House Bill 21-1164* — TABOR — Public School Finance Act — TABOR waivers — voter approval — mill levies.**

This case implicates two provisions of the Colorado Constitution: the constitutional requirement that the legislature "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state," Colo. Const. art. IX, § 2, and the constitutional limitations set forth in the Taxpayer's Bill of Rights ("TABOR"), Colo. Const. art. X, § 20.

Pursuant to article VI, section 3 of the constitution, the supreme court accepted jurisdiction to consider an interrogatory posed by the General Assembly:

> Given that most school districts obtained voter approval to retain all excess property tax revenue but were required, without legal authority, to subsequently reduce their total program mill levies, can the General Assembly, having already mandated that those school districts reset their total program mill levies to the levels that would have been in effect but for the unauthorized reductions, now require such school districts to: (a) gradually eliminate the temporary property tax credits as provided in House Bill 21-1164; and (b) do so without again obtaining voter approval?

In the unique circumstances now before it, the court concludes that the General Assembly may require the districts at issue to gradually eliminate the

temporary tax credits as provided in House Bill 21-1164 without again obtaining voter approval. Here, school district voters previously approved waivers of the applicable TABOR limits; per the erroneous advice of the Colorado Department of Education, the school districts did not implement those waivers; and, in House Bill 21-1164, the General Assembly seeks to eliminate the tax credits at issue simply to effectuate what the voters had previously authorized. In these circumstances, the court perceives nothing in TABOR requiring further voter approval.

Accordingly, the court answers the General Assembly's two-part interrogatory in the affirmative.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 34

### Supreme Court Case No. 21SA97

*Original Proceeding Pursuant to Article VI, Section 3 of the Constitution of the State of Colorado*

**In Re: Interrogatory on House Bill 21-1164 Submitted by the Colorado General Assembly.**

#### General Assembly's Interrogatory Answered
*en banc*
May 24, 2021

**Attorneys for the Colorado General Assembly:**
Recht Kornfeld, P.C.
Mark G. Grueskin
  *Denver, Colorado*

Sharon L. Eubanks, Director, Office of Legislative Legal Services
Julie A. Pelegrin, Deputy Director, Office of Legislative Legal Services
  *Denver, Colorado*

**Attorneys for Governor Jared S. Polis:**
Philip J. Weiser, Attorney General
Terry Gill, First Assistant Attorney General
Russell D. Johnson, Senior Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Attorney General Philip J. Weiser:**
Philip J. Weiser, Attorney General
Natalie Hanlon Leh, Chief Deputy Attorney General
Eric R. Olson, Solicitor General
Kurtis T. Morrison, Deputy Attorney General
Noah C. Patterson, Assistant Solicitor General
  *Denver, Colorado*

**Attorneys for Senators John B. Cooke, Don Coram, Bob Gardner, Dennis Hisey, Chris Holbert, Barbara Kirkmeyer, Larry Liston, Paul H. Lundeen, Ray Scott, Cleave Simpson, James C. Smallwood Jr., Jerry Sonnenberg, and Rob Woodward; and Representatives Mark Baisley, Rod Bockenfeld, Terri Carver, Marc Catlin, Tim Geitner, Ron Hanks, Richard Holtorf, Colin Larson, Stephanie Luck, Mike Lynch, Hugh McKean, Patrick Neville, Rod Pelton, Andres Pico, Kim Ransom, Janice Rich, Shane Sandridge, Matthew Soper, Tonya Van Beber, Kevin Van Winkle, Perry Will, Dave Williams, and Dan Woog:**
Public Trust Institute
Daniel E. Burrows
   *Lakewood, Colorado*

**Attorneys for Colorado Rising State Action:**
Maven Law Group
Suzanne Taheri
George H. Brauchler
   *Denver, Colorado*

**Attorney for the TABOR Foundation:**
Rebecca R. Sopkin
   *Lakewood, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE SAMOUR** concurs in the answer only.
**CHIEF JUSTICE BOATRIGHT** dissents.

¶1     This case implicates two provisions of our state constitution that many Coloradans and, particularly, members of our General Assembly have often found to be in tension: the constitutional requirement that the legislature "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state," Colo. Const. art. IX, § 2, and the constitutional limitations set forth in the Taxpayer's Bill of Rights ("TABOR"), Colo. Const. art. X, § 20.

¶2     Pursuant to article VI, section 3 of our constitution, we accepted jurisdiction to consider what we perceive to be a narrow, albeit significant, interrogatory posed by the General Assembly:

> Given that most school districts obtained voter approval to retain all excess property tax revenue but were required, without legal authority, to subsequently reduce their total program mill levies, can the General Assembly, having already mandated that those school districts reset their total program mill levies to the levels that would have been in effect but for the unauthorized reductions, now require such school districts to: (a) gradually eliminate the temporary property tax credits as provided in House Bill 21-1164; and (b) do so without again obtaining voter approval?

¶3     In the unique circumstances now before us, we conclude that the General Assembly may require the districts at issue to gradually eliminate the temporary tax credits as provided in House Bill 21-1164 without again obtaining voter approval. Here, school district voters previously approved waivers of the applicable TABOR limits; per the erroneous advice of the Colorado Department of

Education ("CDE"), the school districts did not implement those waivers; and, in House Bill 21-1164, the General Assembly seeks to eliminate the tax credits at issue simply to effectuate what the voters had previously authorized. In these circumstances, we perceive nothing in TABOR requiring further voter approval.

¶4 Accordingly, we answer the General Assembly's two-part interrogatory in the affirmative.

## I. Facts and Procedural History

¶5 For almost ninety years, Colorado has funded its school system by a combination of local property tax levies and direct state contributions. *Mesa Cnty. Bd. of Cnty. Comm'rs v. State*, 203 P.3d 519, 523 (Colo. 2009). In accordance with this dual funding system, in 1952, the General Assembly enacted the first School Finance Act. *Id.* This Act provided each school district with an equalization "support level" in an effort to make the amount of money spent per pupil more equitable across the state. *Id.* Although the Act has changed over time, it has always aimed at eliminating spending disparities between school districts through a combination of local and state funding. *Id.* at 523–24.

¶6 In 1992, Colorado voters adopted TABOR, which amended our constitution to limit the ability of governmental entities to impose new taxes or increase their tax revenue absent voter approval, among other things. Colo. Const. art. X, § 20. Under TABOR, "The maximum annual percentage change in each district's

4

property tax revenue equals inflation in the prior calendar year plus annual local growth, adjusted for property tax revenue changes approved by voters after 1991 and [certain reductions not pertinent here]." *Id.* at § 20(7)(c). TABOR, however, authorizes voters to waive this limitation. *Id.* at § 20(7)(d) ("If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset. . . . Voter-approved revenue changes do not require a tax rate change."). The parties do not dispute that the foregoing provisions apply to school districts. *See id.* at §§ 20(1), (2)(b) (providing that certain of TABOR's limits apply to "districts" and defining a "district" as "the state or any local government, excluding enterprises").

¶7 Two years after TABOR was adopted, the General Assembly passed the Public School Finance Act of 1994 (the "PSFA"). The PSFA, as amended, provides the formula for determining state and local funding for the state's school districts. *See Lobato v. State*, 2013 CO 30, ¶¶ 25–27, 304 P.3d 1132, 1140. The PSFA funds the so-called "total program" (i.e., the total amount of money a district receives for operating expenses), first through local funding and then, if a district's local share generates insufficient funds to meet the total program, through state funding. *Id.* The local portion of school funding includes revenue from, among other things, the assessed valuation of the taxable property within the district's boundaries. *Id.*

5

at ¶ 26, 304 P.3d at 1140.

¶8     As pertinent here, the PSFA addressed TABOR's property tax revenue limit on school districts through limitations on the districts' local share mill levies. Specifically, the PSFA provided that, for the 1994 property tax year and for property tax years thereafter, school districts' property tax mill levies were limited to the lesser of:

> (a) The number of mills levied by the district for the immediately preceding property tax year;
>
> (b) The number of mills that will generate property tax revenue in an amount equal to the district's total program for the applicable budget year minus the district's minimum state aid and minus the amount of specific ownership tax revenue paid to the district; or
>
> (c) The number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution.

§ 22-54-106(2), C.R.S. (1994 cum. supp.).

¶9     As a result of TABOR's above-referenced revenue limits, school districts found themselves unable to retain all of the revenue that would otherwise be due them under the 1952 Act and the PSFA. *Mesa Cnty.*, 203 P.3d at 524. Consequently, beginning in 1995, voters in many local school districts began to exempt their districts from these limitations through waiver elections, as authorized by article X, section 20(7)(d) of our constitution. *Mesa Cnty.*, 203 P.3d at 524. In the end, between 1995 and 2006, 175 of Colorado's 178 school districts conducted

6

successful waiver elections, with all but one of these measures containing broadly worded ballot language. *Id.* at 524 & n.3 (noting that the Steamboat Springs School District had passed a ballot measure allowing the district to retain only revenues other than property tax revenue). Although the ballot language differed somewhat from district to district, the ballot measures in the 174 districts adopting more broadly worded provisions authorized the districts to retain and expend "all revenue" or "full revenue" from "any source," notwithstanding TABOR's limitations. *Id.* at 524–25.

¶10 Despite the fact that TABOR's revenue limits had been waived immediately after each of these elections, the CDE continued to advise local school districts to calculate mill levies in accordance with TABOR's growth-plus-inflation limits, as if the districts' voters had not waived those limits. *See id.* at 525, 535. As a consequence, in districts in which property tax revenue grew faster than the TABOR revenue limits allowed, the voter-approved waivers of those limits were not applied, and school districts were required to reduce their mill levies or face reductions in the state's share of total program funding. *Id.*

¶11 The effect of the foregoing was to reduce the average school district mill levy from thirty-eight mills to twenty-one mills, ultimately resulting in school districts losing billions of dollars in property tax revenue. This, in turn, reduced the districts' local share for the total program and required the state to increase its

level of funding to meet the total program funding level.  *See id.*

¶12 To address this significant increase in the state's share of the total program relative to the districts' local share, in 2007, the General Assembly passed, and Governor Ritter signed into law, Senate Bill 07-199.  Senate Bill 07-199 amended the mill levy provisions of the PSFA in two ways.

¶13 First, it amended section 22-54-106(2)(a)(III) (one of the mill levy limitations) to read:

> Except as provided in paragraph (c) of this subsection (2), for reorganized districts, for the 2007 property tax year and property tax years thereafter, each district shall levy the lesser of:
>
> . . . .
>
> (III) *For a district that has not obtained voter approval to retain and spend revenues in excess of the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution*, the number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution.

Ch. 199, sec. 5, § 22-54-106(2)(a), 2007 Colo. Sess. Laws 733, 736 (emphasis added). This amendment ensured that for those districts in which voters had not waived TABOR's revenue limits, those limits would remain in force.

¶14 Second, Senate Bill 07-199 amended the mill levy provisions by adding a state-wide limit of twenty-seven mills.  Ch. 199, sec. 5, § 22-54-106(2)(a)(V), 2007 Colo. Sess. Laws 733, 736.

¶15 In so amending the PSFA, Senate Bill 07-199 recognized that school districts

whose voters had approved broadly worded waivers were not subject to the property tax revenue limits set forth in article X, section 20(7)(c) of TABOR. *Mesa Cnty.*, 203 P.3d at 526. In addition, Senate Bill 07-199 defined districts' local share so as to implement the results of the above-described school district elections, stabilize mill levies, and allow school districts to receive increased property tax revenues due to increased property values. *Mesa Cnty.*, 203 P.3d at 526. Although Senate Bill 07-199 did not alter the applicable property tax rate in any school district, by allowing school districts to retain revenue attributable to increased property values, Senate Bill 07-199 resulted in the collection of an additional $117,838,000 at the local school district level for fiscal year 2007–08. *Mesa Cnty.*, 203 P.3d at 526.

¶16 A number of taxpayers subsequently challenged the constitutionality of Senate Bill 07-199, arguing, as pertinent here, that it violated TABOR's requirements of advance voter approval for (1) tax policy changes directly causing net tax revenue gains to any district, (2) the removal of the property tax revenue limit, and (3) the weakening of any "other limit." *Mesa Cnty.*, 203 P.3d at 528 (citing and quoting Colo. Const. art. X, §§ 20(1), (4), (7)). The case ultimately reached this court, and we rejected each of these arguments. *Id.* at 536. In so ruling, we determined, among other things, that (1) TABOR did not require an additional election for legislation directing a local school district to use funds

9

received as a result of prior valid waiver elections; (2) the above-described local school district elections validly waived TABOR's subsection (7)(c) revenue limits, although the results of these elections were not implemented due to the incorrect manner in which the CDE implemented the PSFA; and (3) because the school districts remained the relevant taxing authorities for purposes of the locally raised revenue, a statewide vote was not required to waive a revenue limit at the local level. *Id.* at 535–36.

¶17 Notwithstanding the foregoing, the impact of the incorrect mill levy reductions that the CDE had directed between 1998 and 2007 persisted because each reduction created a new, lower limit on the affected school districts' total program mill levies above which the PSFA would not allow the mill levies to increase. Accordingly, during the 2020 regular legislative session, the General Assembly passed, and Governor Polis signed into law, House Bill 20-1418, which was designed, in part, to correct the unauthorized reductions. Under this law, beginning in the 2020 property tax year, most school districts were required to correct their total program mill levies in such a way as to reverse the previous, unauthorized reductions. School district taxpayers did not immediately pay more in property taxes due to this corrective action, however, because House Bill 20-1418 also required that school districts for which the total program mill levy was corrected grant a temporary property tax credit for the number of mills by

10

which the mill levy increased above the number of mills levied in the 2019 property tax year.

¶18    To allow the districts to retain the additional revenue from the corrected mill levies, during the 2021 regular legislative session, the General Assembly passed House Bill 21-1164, the legislation that is the subject of the interrogatory now before us. House Bill 21-1164 directs the CDE to adopt a schedule to implement the total program mill levy corrections incrementally, by requiring school districts to reduce the temporary property tax credits adopted in House Bill 20-1418 by no more than one mill per year beginning in the 2021 property tax year. This would result in a complete correction of the mill levy rates in all impacted school districts by 2040. With the implementation of House Bill 21-1164's correction schedule, 127 school districts will impose on their taxpayers a higher number of mills for the total program mill levy for the 2021 property tax year than was imposed for the 2020 property tax year.

¶19    In petitioning this court to accept jurisdiction over the present interrogatory, the General Assembly has represented to us that substantial questions have been raised regarding House Bill 21-1164's constitutionality, including as to:

> (1) The underlying assumption that the General Assembly may correct the CDE's unauthorized mill levy reductions by requiring school districts to reset their total program mill levies to the levels at which the levies would have been but for the unauthorized reductions, without requiring a school district to obtain prior voter approval under article X, section 20(4) of TABOR; and

11

(2) The fact that, in implementing the correction of its total program mill levy by reducing the temporary property tax credit in accordance with the correction schedule, a school district is assessing a "mill levy above that for the prior year", which normally requires prior voter approval under article X, section 20(4) of TABOR.

¶20 We accepted jurisdiction.

## II. Analysis

¶21 We begin by addressing our jurisdiction over this matter, and in connection with that discussion, we consider the argument of the group of legislators whom we will respectfully call the Opposing Legislators, that we should dismiss as improvidently granted the General Assembly's petition to consider the interrogatory now before us. After declining to dismiss the petition, we proceed to the merits of the issues presented in the interrogatory.

### A. Jurisdiction

¶22 Pursuant to article VI, section 3 of the Colorado Constitution, this court has original jurisdiction to give its opinion on "important questions upon solemn occasions when required by the governor, the senate, or the house of representatives."

¶23 In complying with this constitutional mandate, we have long observed that the duty rests on us to determine the solemnity of the occasion and the importance of the questions propounded. *In re Interrogatories of the House*, 162 P. 1144, 1144 (Colo. 1917). In addition, we have observed, "It has been the universal rule in this

jurisdiction that in order to secure answers to legislative questions they must be connected with pending legislation, and relate either to the constitutionality thereof, or to matters connected therewith pertaining to purely public rights." *Id.*; *accord In re Submission of Interrogatories on House Bill 99-1325*, 979 P.2d 549, 554 (Colo. 1999).

¶24 Here, the interrogatory at issue is indisputably connected with pending legislation, and it directly relates to the constitutionality of that legislation. Moreover, we have little difficulty concluding that the legislation presents important questions upon a solemn occasion. As the General Assembly observed in the joint resolution authorizing its petition to this court, unless we resolve the questions presented, (1) the state and local school districts will lack certainty as to the appropriate level of school districts' total program mill levies and the concomitant level of state funding required for public education beginning in the 2021–22 fiscal year; (2) in proceeding without a determination as to House Bill 21-1164's constitutionality, school districts would risk the costs and delays of legal action and potentially substantial refund obligations under TABOR if the increases in total program mill levies are ultimately found to be unconstitutional, thereby significantly taxing school districts' already strained finances; and (3) individual lawsuits brought against multiple school districts in multiple judicial districts would create substantial unnecessary costs for, and confusion among, school

13

districts and could result in a patchwork of inconsistent district court decisions.

¶25 Accordingly, we conclude that this case is an appropriate one for the exercise of our jurisdiction under article VI, section 3 of our constitution. In so deciding, we respectfully disagree with the Opposing Legislators' assertion that this court should dismiss the General Assembly's petition as improvidently granted because (1) the factual record is undeveloped and any decision by this court could prejudice the rights of parties not before us; (2) the question presented is a difficult one; (3) the court must construe multiple statutes or constitutional provisions; (4) the court's opinion should be sought only as a last resort and ordinarily after the legislature has first sought the opinions of the Attorney General or the legislature's own Office of Legislative Counsel; and (5) the court should be careful not to involve itself in what is essentially a political dispute.

¶26 As to the Opposing Legislators' first two concerns, those apprehensions would seem likely to apply to any interrogatory regarding proposed legislation submitted by the General Assembly. By its very nature, proposed legislation is not likely to have been litigated (although in the present case, we actually have the benefit of the factual development that occurred in the *Mesa County* case), and we deem it safe to assume that the General Assembly would not take the extraordinary step of submitting an interrogatory to us unless the matter raised difficult questions. In addition, for two reasons, we do not perceive a material risk

14

of prejudice to the rights of absent parties in this case. First, the court has benefitted from the excellent briefing of all parties and amici curiae in this case, as well as the excellent oral arguments of lead counsel for both the General Assembly and the Opposing Legislators. As a result, we feel confident that we have been well advised as to the issues now before us and that the interests of any absent parties have been well represented. Second, as noted above, although the issue presented is certainly significant, we deem it to present a narrow question, principally requiring us to construe the pertinent provisions of TABOR in light of the undisputed and unique facts before us.

¶27 With respect to the Opposing Legislators' concern that the interrogatory at issue requires us to construe multiple statutes or constitutional provisions, many cases require the same of us, and we do not perceive that fact alone as a reason to decline to exercise jurisdiction.

¶28 As to the Opposing Legislators' view that this court's opinion should be sought only as a last resort and ordinarily after the legislature has first sought the opinions of the Attorney General or the legislature's own Office of Legislative Counsel, we perceive no such requirement in our constitution. In addition, any such opinions would not be binding on us. And in any event, the Attorney General has submitted a brief in this case. Accordingly, we have the benefit of his position on this matter.

¶29 Lastly, although we acknowledge the Opposing Legislators' admonition that we should be careful not to involve ourselves in what is essentially a political dispute, we are not persuaded that deciding whether proposed legislation is consistent with our constitution necessarily mires us in such a dispute, particularly when, as here, deciding this question does not require any underlying factual determinations. And to the extent that the interrogatory before us has political overtones, we expect that the same could be said of any interrogatory in which a minority of legislators opposed the submission to us. Our colleagues in the legislature grapple with difficult policy questions all the time. The fact that the proposed legislation on which we are asked to opine may potentially implicate difficult policy questions is therefore unsurprising, and, in our view, it does not provide a sufficient reason for us to decline to consider this matter. Indeed, to conclude otherwise might incorrectly suggest that we may not consider an interrogatory submitted by the General Assembly unless legislators unanimously agree to its submission. Our constitution, however, does not require such unanimity, and we are not at liberty to impose such a requirement.

¶30 For these reasons, we decline to dismiss the petition before us as improvidently granted, and we proceed to the merits of the questions presented.

### B. Whether House Bill 21-1164 Complies with TABOR

¶31 In construing a constitutional provision like TABOR, our goal is to

16

determine and effectuate the will of the people in adopting the measure. *Bolt v. Arapahoe Cnty. Sch. Dist.*, 898 P.2d 525, 532 (Colo. 1995). To accomplish this purpose, we give the provision's terms their ordinary and plain meanings, and we endeavor to avoid constructions that would produce unreasonable or absurd results. *Id.* In addition, we favor a construction that harmonizes different constitutional provisions over one that creates conflict between the provisions. *Id.* And if more than one interpretation is supported by TABOR's language, then TABOR instructs that "[i]ts preferred interpretation shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1); *accord Bolt*, 898 P.2d at 532. That said, we have consistently rejected interpretations of TABOR that "would hinder basic government functions or cripple the government's ability to provide services." *Barber v. Ritter*, 196 P.3d 238, 248 (Colo. 2008).

¶32 Turning then to the statutory and constitutional provisions at issue, we begin by noting the General Assembly's legislative findings in the PSFA, as amended, because those findings necessarily underlie the legal issues now before us. Those findings are as follows:

> The general assembly finds that, for property tax years 1994 through 2006, subsection (2)(a)(III) of this section, as it existed before May 9, 2007, was wrongly interpreted and applied to reduce several districts' property tax mill levies to the number of mills that a district could levy under the property tax revenue limitation imposed by section 20 of article X of the state constitution, even though the district had obtained voter approval to retain and spend revenue in excess of that property tax revenue limitation. The general assembly finds,

17

therefore, that the reductions in district mill levies for property tax years 1994 through 2006 were not authorized by statute and are void for purposes of determining a district's correct mill levy pursuant to this subsection (2.1) for the 2020 property tax year and property tax years thereafter, and the determination and levy of the correct number of mills that a district is required to levy pursuant to this subsection (2.1) does not require action by the district other than to certify the mill levy.

§ 22-54-106(2.1)(a), C.R.S. (2020).

¶33 The PSFA then states, in pertinent part:

For the 2020 property tax year, except as otherwise provided in subsection (2.1)(e) of this section for reorganized districts:

(I) *A district that has obtained voter approval to retain and spend revenue in excess of the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution* shall levy the lesser of:

(A) Twenty-seven mills;

(B) The number of mills that the district would have been required to levy under subsection (2)(a) of this section for the 2020 property tax year if not for the unauthorized reductions in the district's mill levy in property tax years following the property tax year in which the district obtained voter approval to retain and spend revenue in excess of the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution, which reductions resulted from the unauthorized application of subsection (2)(a)(III) of this section as it existed before May 9, 2007; or

(C) The number of mills that will generate property tax revenue in an amount equal to the district's total program for the applicable budget year minus the amount of specific ownership tax revenue paid to the district.

§ 22-54-106(2.1)(b) (emphasis added).

¶34 And the PSFA provides:

18

> In a property tax year in which a district, pursuant to this subsection (2.1), is required to levy a greater number of mills than it levied in the 2019 property tax year, the district board of education by resolution shall grant a temporary property tax credit equal to the number of mills levied in the applicable property tax year that exceeds the number of mills levied in the 2019 property tax year.

§ 22-54-106(2.1)(d).

¶35 In an effort to correct the CDE's unauthorized mill levy reductions and to reset school district mill levies to the levels at which they would have been but for the unauthorized reductions, House Bill 21-1164 now proposes to eliminate, over time, the temporary tax credits set forth in section 22-54-106(2.1)(d) and to do so without again obtaining voter approval. The question before us is whether doing so would violate TABOR. We conclude that it would not.

¶36 Subject to certain exceptions, TABOR requires the state and any local government to obtain advance voter approval for, among other things, "any new tax, tax rate increase, mill levy above that for the prior year, . . . or a tax policy change directly causing a net tax revenue gain to any district." Colo. Const. art. X, § 20(4)(a).

¶37 Because the state and local government obligations under TABOR are independent of one another, whether TABOR requires advance voter approval to reduce the temporary tax credits at issue requires us to analyze separately TABOR's application to the state and to the school districts. *See Mesa Cnty.*, 203 P.3d at 528 (noting that because districts, as defined under TABOR, are viewed

as separate entities, the court was required to determine independently whether TABOR was violated at the state level and whether it was violated at the local school district level).

¶38 The question of whether the incremental elimination of the temporary tax credits requires statewide voter approval need not detain us long. As we observed in *Mesa County*, 203 P.3d at 528, in Colorado's dual-funded school finance system, "the local government is the relevant taxing authority for the local share of the dual funding program, even if the tax is levied under the direction of the state." This is because the state itself is not authorized to levy a local property tax. *Id.* Rather, from a constitutional perspective, local governments like the districts here "are responsible for imposing, collecting and expending local property taxes." *Id.* Accordingly, only the school districts are in a position to impose or effectuate any new tax, tax rate increase, mill levy above that for the prior year, or tax policy change directly causing a net tax revenue gain to any district. *See id.*; *see also id.* at 530 (noting that because the school district is the relevant taxing authority in Colorado's dual school funding system, "the school district is the only 'district' with the authority to change tax policy within the meaning of article X, section 20" and therefore subsection (4)(a) of TABOR does not require an additional vote at the state level).

¶39 The question thus becomes whether TABOR requires the school districts to seek advance voter approval for the incremental elimination of the temporary tax credits established in House Bill 20-1418. This, in turn, obliges us to consider whether the elimination of such credits, on the facts presented, amounts to a new tax, tax rate increase, mill levy above that for the prior year, or tax policy change directly causing a net tax revenue gain to any district. Colo. Const. art. X, § 20(4)(a).

¶40 As an initial matter, we note that the parties and amici curiae do not appear to agree on which of the foregoing TABOR-related events is arguably implicated in this case. We, however, agree with the General Assembly, the Governor, and the Attorney General that the proposed legislative action before us most directly implicates TABOR's prohibition on the imposition of a mill levy above that for the previous year without prior voter approval. Accordingly, we will begin there.

¶41 The Opposing Legislators and their amici curiae characterize this as a simple case: House Bill 21-1164 proposes the adoption of a correction schedule that would expressly allow districts to reduce the temporary tax credit as quickly as possible but by no more than one mill each property tax year, and this necessarily means that the mill levy will increase over the prior year. But this argument ignores the voter waiver elections that occurred after the PSFA became law. Although, to be sure, those waiver elections were specifically aimed at TABOR's revenue limits, as

we made clear in *Mesa County*, it would belie reality to suggest that these elections were unrelated to the then-existing mill levies. Specifically, in *Mesa County*, 203 P.3d at 525, we observed that because of the CDE's incorrect guidance, the voter-approved waivers of the revenue limits were not applied, and the school districts were required to reduce their mill levies. We further deemed it logical to assume that voters who waived the limits on "all revenues" and "full revenues" understood their votes to apply to the greatest portion of those revenues, namely, property taxes, and not simply to peripheral funding sources. *Id.* at 534. In light of the foregoing, we agree with the General Assembly that it likewise makes sense to assume that in voting to waive TABOR's revenue limits, school district voters understood that their votes were predicated on the continuation of the mill levy rates then in effect. To conclude otherwise and to ratify the CDE's actions in effectively forcing mill levy decreases on the school districts in the wake of the successful waiver elections would be contrary to the voters' expressed intent to allow their school districts to retain and expend for school financing purposes "all" or "full" revenue from "any source," based on the mill levy rates then in effect, notwithstanding the limitations set forth in TABOR.[1]

---

[1] We perceive nothing in our view that runs contrary to our Constitution's single-subject rule. Colo. Const. art. V, § 1(5.5). That rule provides, "No measure shall be proposed by petition containing more than one subject, which shall be

¶42 Accordingly, in our view, in voting to waive the TABOR revenue limits in connection with the PSFA, the voters who authorized those waivers necessarily approved the mill levies in effect at the time they voted, which mill levies resulted in the very excess revenues for which the waivers were required. As a result, the elimination of the tax credits at issue must be understood as an effort to restore the mill levy rates that the voters had previously approved but that were not implemented due to the CDE's erroneous guidance, and the question becomes whether another election is required for that purpose.

¶43 In this regard, although, strictly speaking, the question before us is one of first impression, we perceive a number of our prior cases to be instructive.

¶44 In *Bolt*, 898 P.2d at 536, for example, taxpayers challenged, among other things, a particular mill levy increase on the ground that the levy was above that for the prior year and therefore required prior voter approval under TABOR. *Bolt* concerned a scenario in which property owners had successfully contested the county assessor's property valuations. *Id.* at 528–29. As a result, the assessor

---

clearly expressed in its title." *Id.* No party in this case, however, has suggested that TABOR elections are petition measures, nor are we aware of any authority suggesting that they are. In addition, TABOR itself provides that "districts may consolidate ballot issues," suggesting that several TABOR-related changes could, in fact, be combined for purposes of a single vote under TABOR. Colo. Const. art. X, § 20(3)(a).

23

issued either refunds or abatements to the owners (depending on whether they had already paid the erroneously assessed taxes) and adjusted the amount of tax revenue to which the school district was entitled. *Id.* at 529. This adjustment resulted in net losses to the district of nearly $1.3 million, and to recoup that lost revenue, the district increased its mill levy, resulting in the challenge on TABOR grounds. *Id.* We, however, rejected this challenge, concluding that the mill levy at issue did not require prior voter approval. *Id.* at 537. We reasoned, "Even though the abatements and refunds mill levy was technically above that for the prior year, it operates merely to recoup lost revenue that, but for the assessor's errors, would have been collected from the property owners." *Id.* Accordingly, we determined that the mill levy did not operate as a tax increase requiring prior voter approval. *Id.* To conclude otherwise would have produced "a rigid interpretation" of TABOR that "would have [had] the effect of working a reduction in government services," and we declined to adopt such an interpretation. *Id.*

¶45 Thereafter, in *Mesa County*, 203 P.3d at 528, a group of taxpayers challenged the constitutionality of Senate Bill 07-199, contending that it was enacted in violation of several TABOR provisions requiring advance voter approval. We, however, rejected this challenge, ultimately concluding, "Once a revenue limit is validly waived, it is unnecessary to require a second election for later legislation

directing the use of the additional funds that a district received as a result of the waiver election." *Mesa Cnty.*, 203 P.3d at 530.

¶46 And in *Huber v. Colorado Mining Ass'n*, 264 P.3d 884, 886–87 (Colo. 2011), we considered a challenge to what the plaintiffs deemed a tax rate increase requiring advance voter approval. In *Huber*, a statute enacted several years before TABOR's effective date established a formula for calculating the amount of tax due per ton of coal extracted by coal companies. *Id.* at 886. Specifically, this statute established a tax with a tax rate comprising two components, namely, a base rate of $0.36 per ton of coal extracted and a quarterly one percent increase or decrease to the base rate premised on changes to the producers' prices index. *Id.* The Department of Revenue employed this formula until TABOR went into effect, after which the Department stopped using the mechanism set forth in the statute for calculating upward adjustments in the amount of coal severance tax owed. *Id.* Some fifteen years later, however, after a State Auditor's review, an Attorney General's opinion, and a rulemaking proceeding, the Department recommenced applying the statute, and the subsequent implementation resulted in a tax of $0.76 per ton of coal extracted, as compared with the $0.54 per ton that had been collected at the time TABOR was adopted. *Id.* at 886–87. The Colorado Mining Association and a number of taxpayer coal companies then sued, asserting that, under TABOR, whenever the Department calculates an upward adjustment in the amount of tax

due under the statute, it must obtain voter approval. *Id.* at 887. We ultimately disagreed, however, holding that the Department's implementation of the statute was not a tax rate increase, but rather was a non-discretionary duty required by a pre-TABOR taxing statute. *Id.* Accordingly, advance voter approval was not required, and we thus upheld what we described as "[t]he Department's correction of [its] incorrect practice" of failing to enforce its legislative mandate to apply the statutorily prescribed formula and collect the tax due. *Id.* at 887, 893.

¶47 We believe that the reasoning of these cases applies with equal force here. As in *Mesa County*, the school district voters validly waived TABOR's revenue limits and, for the reasons set forth above, necessarily approved the mill levies in effect at the time they voted. House Bill 21-1164 does no more than effectuate the voters' expressed intent. Accordingly, we perceive no basis for requiring a second election to ask the voters to re-approve what they have already approved.

¶48 Similarly, as in *Bolt* and *Huber*, we are not persuaded that a new election is required when the government acts to correct an error (here, the CDE's incorrect guidance) and to implement a taxation mechanism that should have been in place all along. To conclude otherwise would mean that (1) school district voters can vote to waive TABOR revenue limits so that their districts may retain and expend "all" or "full" revenue from "any source"; (2) the state can undermine the express will of the voters and violate the PSFA by improperly forcing districts to lower

26

their mill levies (thereby depriving the districts of the excess revenues that the voters approved); and (3) the state and the school districts would be powerless to remedy such a violation without a new election. We, however, must avoid a construction that would produce so unreasonable or absurd a result. *See Bolt*, 898 P.2d at 532.

¶49 Stated simply, although the mill levies at issue will ultimately return to the rates in effect when the voters authorized the retention of all revenues in excess of TABOR limits, no new vote is required because House Bill 21-1164 simply effectuates what the voters have already approved and does not permit mill levies above that level. *See Bruce v. Pikes Peak Libr. Dist.*, 155 P.3d 630, 632 (Colo. App. 2007) (upholding a mill levy increase based on pre-TABOR voter approval when the voters had approved an increase of the maximum mill levy from two mills to no more than four mills and the mill levy never exceeded four mills). Moreover, as we said in *Mesa County*, 203 P.3d at 535, "There were no time limits included in the waiver elections that would bar the General Assembly from acting at a later date" to implement the results of earlier elections.

¶50 For the same reasons, to the extent that one could construe House Bill 21-1164's elimination of the tax credits at issue as either a new tax or a tax rate increase (and it is not clear to us that it is either), no new vote is required because the voters have already approved what the Opposing Legislators and their amici

curiae appear to characterize as a new tax or tax rate increase.

¶51 And we are unpersuaded that House Bill 21-1164 effectuates a tax policy change directly causing a net tax revenue gain to the district. House Bill 21-1164 proposes to eliminate the *temporary* tax credits created by House Bill 20-1418. Because these tax credits were never intended to be permanent, phasing them out does not reflect any change in tax policy.

¶52 For these reasons, we conclude that the General Assembly may, consistent with TABOR's requirements, gradually eliminate the temporary property tax credits adopted in House Bill 20-1418 without obtaining further voter approval.

¶53 In reaching this conclusion, we are unpersuaded by the Opposing Legislators' contention that House Bill 21-1164 violates article X, section 7 of our constitution. That provision states, "The general assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation." *Id.* For the reasons set forth above, however, the General Assembly has not imposed any state tax for the purposes of any local governmental entity here. Rather, the school districts are the relevant taxing authorities, and "a dual state/local funded program is constitutionally permitted if both the state and the local entity have an interest in the subject matter of the program." *Mesa Cnty.*, 203 P.3d at 528.

28

¶54 We likewise are not persuaded by the Opposing Legislators' contention that House Bill 21-1164 violates article IX, section 15 of our constitution. That provision, known as the Local Control Clause, grants locally elected school boards "control of instruction in the public schools of their respective districts." As we stated in *Lobato*, ¶ 34, 304 P.3d at 1141, however, "The dual-funded public school financing system complies with the Local Control Clause because it affords local school districts control over locally-raised funds and therefore over 'instruction in the public schools.'" House Bill 21-1164 does no more than implement, in part, this dual funding system, and, contrary to the Opposing Legislators' position, we perceive nothing in that legislation that can be deemed as coercive.

¶55 Finally, contrary to the arguments presented by the Opposing Legislators and amicus curiae Colorado Rising State Action, answering the interrogatory before us in the affirmative in no way condones a two-step procedure for evading TABOR. Specifically, these parties express concern that if we answer the present interrogatory in the affirmative, then the General Assembly could, hypothetically, in Year 1, approve a one dollar per gallon gas tax increase along with a corresponding one dollar per gallon temporary tax credit (resulting in no net tax increase) and then in Year 2, simply eliminate that tax credit (completing a perceived end-run around TABOR's voter approval requirements). For purposes here, we need only observe that in this case, in contrast to the hypothetical gas tax

increase, the voters have previously approved what the General Assembly is attempting to implement, and we have made clear that, in such circumstances, corrections like these are permissible without additional voter approval. *See, e.g.*, *Bolt*, 898 P.2d at 536 (noting that "the school district had voter approval in advance for its bond redemption mill levy increases" and that this satisfied the requirements of TABOR); *cf. Huber*, 264 P.3d at 893 (permitting the "correction of [an] incorrect practice" when the Department of Revenue had failed to enforce a legislative mandate for calculating upward adjustments in the amount of coal severance tax owed). Thus, allowing the mill levy corrections before us will not open the door to "trickery" by the General Assembly, as the Opposing Legislators and Colorado Rising State Action suggest. Nor may the General Assembly simply label any past mill levy as "incorrect" as a cover for raising taxes without prior voter approval. Rather, we simply conclude, in the unique circumstances presented, that the General Assembly may act to effectuate mill levies that voters have previously approved but that, due to an error, were not given full effect. We express no opinion on, nor should anything in this opinion be read to condone, the type of two-step procedure for evading TABOR requirements that the Opposing Legislators and Colorado Rising State Action posit.

## III. Conclusion

¶56    For the foregoing reasons, we conclude that in the circumstances presented

30

here, the gradual elimination of the tax credits previously adopted in House Bill 20-1418 does not impose or effectuate a new tax, tax rate increase, mill levy above that for the prior year, or a tax policy change directly causing a net tax revenue gain to any district. Instead, this legislative action simply implements what voters in most Colorado school districts approved when they voted to authorize their school districts to retain and expend "all revenue" or "full revenue" from "any source," notwithstanding TABOR's revenue limitations. Accordingly, we conclude that the General Assembly may, consistent with TABOR's requirements, gradually eliminate the temporary property tax credits enacted in House Bill 20-1418 without obtaining further voter approval.

¶57 We therefore answer the General Assembly's two-part interrogatory in the affirmative.

**JUSTICE SAMOUR** concurs in the answer only.
**CHIEF JUSTICE BOATRIGHT** dissents.

JUSTICE SAMOUR, concurring in the answer only.

¶58 I align with the majority in purpose, though not in approach. While I agree that we should answer the General Assembly's two-part interrogatory in the affirmative, I write separately because, in doing so, I would take a slightly different tack.

¶59 The majority's rationale is premised, in part, on the "assum[ption] that in voting to waive" the revenue limits in the Taxpayer's Bill of Rights ("TABOR"), "school district voters understood that their votes were predicated on the continuation of the mill levy rates then in effect." Maj. op. ¶ 41. That assumption may well be reasonable, notwithstanding the dissent's protestations. But I don't think we need to go there. In my view, the years-long 1994 Public School Finance Act ("PSFA") violations—not implied voter consent to static mill levy rates—serve as the better linchpin for our decision. And while that shift in focus may seem, at first blush, to be largely cosmetic, the differences in the resulting analysis are eminently substantive and have the collateral benefit of neutralizing the dissent's principal contentions. Therefore, I respectfully concur in the answer only.

## I. The Mill Levy Decreases Made Pursuant to Erroneous CDE Guidance Are Ultra Vires (or Illegal) and Void[1]

¶60 To set the stage for my conclusion—and that of the Attorney General—that the mill levy decreases made pursuant to erroneous Colorado Department of Education ("CDE") guidance are ultra vires (or illegal) and void, I must first revisit the PSFA's statutory text. In limiting school districts' local share of mill levies, the PSFA provides that, "[f]or the 1994 property tax year and property tax years thereafter, each district *shall* levy the lesser of":

> (a) The number of mills levied by the district for the immediately preceding property tax year;
>
> (b) The number of mills that will generate property tax revenue in an amount equal to the district's total program for the applicable budget year minus the district's minimum state aid and minus the amount of specific ownership tax revenue paid to the district; or
>
> (c) The number of mills that may be levied by the district under the property tax revenue limitation imposed on the district by section 20 of article X of the state constitution.

¶61 § 22-54-106(2), C.R.S. (1994 cum. supp.) (emphasis added). The last of these options, option (c), is the lens through which the 1995–2006 PSFA violations come

---

[1] An ultra vires act is one that "[a] governmental agency lacks legal authority to perform." 18 McQuillin Mun. Corp. § 53:77.28 (3d ed.). Under Colorado law, ultra vires acts are considered void.

into focus.[2] As relevant here, TABOR, which is enshrined in section 20 of article X of the Colorado Constitution and incorporated by reference in PSFA's option (c), limits the year-over-year increase in property tax revenue a district can receive to: "inflation in the prior calendar year plus annual local growth, *adjusted for property tax revenue changes approved by voters* after 1991." Colo. Const. art. X, § 20(7)(c) (emphasis added). Put simply, TABOR sets forth a property tax revenue limit but allows voters to waive it at the ballot box.

¶62 Indeed, that is exactly what happened in 175 of Colorado's 178 school districts. In those 175 districts, the 1994 PSFA's "lesser of [the following mill levies]" formula should have included only options (a) and (b). *See* § 22-54-106(2) (setting forth that "each district shall levy the lesser of" the three outlined levy options). And the reason is straightforward: By previously authorizing their districts to retain revenue in excess of TABOR's limit, voters had effectively struck the third option—option (c)—from the PSFA formula.

¶63 But despite the fact that the PSFA referenced *all* of article X, section 20—

_____

[2] This date range is bookended by: (1) 1995, the year after the PSFA was enacted, *see* § 22-54-106(2), C.R.S. (1994 cum. supp.), and (2) 2006, the year before the General Assembly amended the PSFA in SB 07-199 to include explicit reference to TABOR's waiver provision, *see* Ch. 199, sec. 5, § 22-54-106(2)(a), 2007 Colo. Sess. Laws 733, 736.

including the TABOR waiver provision in option (c)—the CDE applied the PSFA as if TABOR's waiver provision did not exist. It altogether neglected that provision. Districts that had successfully waived TABOR's property tax revenue limit—and were therefore *required* to ignore option (c) under the PSFA's non-discretionary formula—were instead *improperly forced* by the CDE to consider it. And because that last option, option (c), was often the "lesser of" the outlined mill levies, and because each illegal reduction lowered the levy limit for the following year, the local share of public education funding steadily decreased until the passage of SB 07-199 in 2007, resulting in the predicament Colorado finds itself in today.[3]

¶64 Having examined the interplay between the PSFA, TABOR, and the waiver elections, I can now pull the curtain back and spotlight the leitmotif of my approach: The mill levy decreases that took place as a result of CDE's erroneous

---

[3] While SB 07-199 may have stopped the bleeding by explicitly calling attention to the TABOR waiver provision, it did not heal the wound; thus, the mill levies from 2007 to present cannot "serve as the reference point[s] for setting mill levy rates today." Diss. op. ¶ 96 n.10. Why the General Assembly did not attempt a curative when it first identified the error, *see id.* at ¶ 23 n.12, we cannot say. But its decision to do so now in HB 20-1418 and HB 21-1164 reflects a policy decision that we, as the judiciary, cannot second guess. What we do know is this: The current levy rates cannot serve as reference points because they are impacted by, and therefore perpetuate, *illegal* levy limits.

4

guidance weren't just unnecessary, "perhaps mistaken,"[4] or merely in tension with implied voter consent; they were downright *illegal*. The PSFA's mill levy formula uses the word "shall." § 22-54-106(2). That formula was, therefore, mandatory, not merely suggestive. *People v. Hyde*, 2017 CO 24, ¶ 28, 393 P.3d 962, 969 ("The legislature's use of the word 'shall' in a statute generally indicates its intent for the term to be mandatory."). As such, it was not subject to the CDE's discretion. And, as a mandate, it was either applied correctly, or it wasn't.

¶65    Here, for far too long, it wasn't: Between 1995 and 2006, the CDE, for all intents and purposes, instructed most school districts—those that had held waiver elections—to violate the PSFA by incorrectly applying a non-discretionary formula. Whether the CDE did so intentionally or negligently is not reflected in the record and is, in any event, beside the point. What matters for our purposes is that the CDE instructed the school districts in such a way and that, as a result, the mill levies set during that time are void as ultra vires actions—those that "[a] governmental agency lacks legal authority to perform." 18 McQuillin Mun. Corp.

---

[4] Diss. op. ¶ 93 ("Furthermore, the CDE direction that required districts to decrease their mill levy rates—though *perhaps mistaken*—is nothing like a mere miscalculation of property values by a local assessor." (Emphasis added.)).

5

§ 53:77.28 (3d ed.).[5]

¶66    That conclusion is supported by our decision in *Mesa County*, where we lamented that voter intent "was not implemented because of the manner in which the CDE administered the [PSFA]." *Mesa Cnty. Bd. of Cnty. Comm'rs v. State*,

---

[5] The dissent asserts that it is "unwilling to make assumptions about the CDE's guidance or the district's implementation of such guidance." Diss. op. ¶ 88 n.6. To be clear, however, we need not make assumptions. The record reflects that the districts, at the CDE's behest, acted without authority in violating the PSFA. And where, as here, a governmental agency's actions are without authority and violate Colorado law, those actions are ultra vires and void. *See, e.g.*, *Town of Superior v. Midcities Co.*, 933 P.2d 596, 602 (Colo. 1997). On this point, our opinion in *Midcities Co.* is instructive. There, the town of Superior effected an annexation in violation of the Municipal Annexation Act of 1965 ("Annexation Act"). *Id.* at 598. After assessing the town's conduct, this court voided the ordinances effecting the annexation under section 31-12-116(3), C.R.S. (2020). *Midcities Co.*, 933 P.2d at 602. In support of our decision, we relied on the ultra vires doctrine as set forth in *Glendinning v. Denver*. *Id.* at 602 n.8 (citing *Glendinning v. Denver*, 114 P. 652, 652 (Colo. 1911) ("All municipal ordinances must be in harmony with the general law of the state; if they are inconsistent or repugnant to such general law, they are void, ultra vires, and no one can be convicted for violating a void ordinance.")). While Superior, as a municipality, had the authority to annex land, it did not have the authority to do so in violation of the Annexation Act. Similarly, here, although the school districts had every right to certify mill levies, they did not have the authority to do so in violation of the PSFA. In the same vein, while the CDE may have had authority to issue guidance on levy-limit compliance, it did not have authority to direct districts to violate the PSFA or TABOR (or both). *See City & Cnty. of Denver v. Palmer*, 342 P.2d 687, 688 (Colo. 1959) (reasoning that "any attempt by the City to legislate [driving with a suspended license] is ultra vires and void," as it is an issue of statewide importance, which must be prosecuted under state statute).

6

203 P.3d 519, 535 (Colo. 2009). This was a problem, we reasoned, because "[t]he waiver elections were effective immediately" and had given school districts "the right to receive property tax revenue above the [revenue] limit" set by TABOR. *Id.* But rather than recognize that "all limits had been waived immediately," we continued, the CDE had kept advising school districts "to certify mill levies in accordance with the property tax revenue limit of subsection (7)(c), and to reduce their mill levies when property tax revenues rose faster than the revenue limits permitted." *Id.*

¶67 The General Assembly took to heart our remarks in *Mesa County* and codified the notion that mill levy reductions made pursuant to the CDE's erroneous guidance "were not authorized by statute and are void for the purposes of determining a district's correct mill levy." § 22-54-106(2.1)(a), C.R.S. (2020). And my colleagues in the majority imply that they, too, view the mill levy decreases in question as illegal. *See* maj. op. ¶ 48 (explaining that answering the interrogatory in the negative would permit the state to "violate the PSFA").

¶68 With that, act one of my analysis concludes. I turn to act two next.

## II. The Last "Prior Year" Means the Last, Legally Levied Year

¶69 TABOR requires that the state or any local government entity obtain advance voter approval for "any new tax, tax rate increase, [or] mill levy above that for *the prior year*." Colo. Const. art. X, § 20(4)(a) (emphasis added). But no one

7

can reasonably contend—and no one does here—that illegally levied mills should serve as a basis for subsequent calculations of TABOR-compliant levy limits. Recall that illegal levies are *void*. Void levies cannot serve as reference points for subsequent calculations. So, where does that leave us? Moving forward, we must calculate levies by turning to the last *legally* levied year. That is exactly what HB 21-1164 aims to do. Given that context, until the levies are *fully* reset and no longer impacted by statutory violations, "the prior year," for TABOR purposes, has to mean "the prior [legally levied] year." This determination doesn't add words to the constitution, *see* diss. op. ¶ 79 n.1, but instead effectuates Colorado law in general and the ultra vires doctrine in particular.

¶70    To conclude otherwise would be to permanently intertwine future levy limits with past illegal levy limits and render Colorado powerless to halt the domino effect of statutory violations like the ones that occurred here. It would also incentivize an entity like the CDE to, at worst, intentionally disregard the law, and, at best, negligently misapply it. Such a result would be unjust, absurd, and unreasonable, and should therefore be avoided. *Bickel v. City of Boulder*, 885 P.2d 215, 229 (Colo. 1994) ("[A]n unjust, absurd[,] or unreasonable result should be avoided when construing a constitutional provision.").

¶71    While on the surface, and devoid of context, it may seem that HB 21-1164 yields a series of unconstitutional mill levy increases, the reality is far more

8

complex. Indeed, for every year that HB 21-1164 includes a property tax credit to offset a portion of the reset levy rates, there will be, for TABOR purposes, a mill levy *decrease*. Then, when the last credit has been phased out, the mill levy rate will be at equilibrium with that of the "prior [legally levied] year." Viewed in this light, there is no year-over-year mill levy increase or correction. As such, nothing in TABOR requires the General Assembly or school districts to obtain voter approval before implementing the contemplated legislative action.

### III. The Void as Ultra Vires Approach Better Supports Our Answer

¶72 Finally, as an epilogue, I note that the void as ultra vires approach has the ancillary advantage of warding off the dissent's most potent criticisms. I take them each in turn.

¶73 First, the dissent chides the majority for "assum[ing] that in voting to waive TABOR's revenue limits, school district voters understood that their votes were predicated on the continuation of the mill levy rates then in effect." Diss. op. ¶ 83 ("That is a big assumption—one I am unwilling to make, and in my view, one that the constitution prohibits anyone from making."). But the void as ultra vires approach turns on no such "big assumption" and, notably, leads to the very same conclusion that the majority reaches today: The General Assembly's two-part interrogatory should be answered in the affirmative.

¶74 Second, and relatedly, the dissent professes concern that the majority's

reasoning ascribes two subjects to HB 21-1164, in violation of Colorado's "single-subject" requirement, which "is intended to ensure that each proposal depends upon its own merits for passage." *Id.* at ¶ 8 (quoting *Matter of Title, Ballot Title, Submission Clause, Summary for 1997-98 No. 84*, 961 P.2d 456, 458 (Colo. 1998) (internal quotations omitted)). In contrast to the majority's approach, however, the void as ultra vires approach does not require me to conclude that the voters *both* explicitly waived the revenue limit *and* impliedly approved of the then-existing mill levy rate for all future years. The proof is in the pudding: My analysis relies only on the voters' explicit revenue limit waiver, which we previously acknowledged in *Mesa County*, 203 P.3d at 525.

¶75 And third, the dissent takes issue with the majority's characterization of HB 21-1164 as a "correction" because, in the dissent's view, the "correction" is really an increase in a correction's clothes. Diss. op. ¶ 87. Under the void as ultra vires approach, however, there is no increase. Instead, TABOR-compliant levy limit calculations would simply reference the "prior [legally levied] year" until the statutory and constitutional violations no longer impact levy rates. As mentioned above, it would defy reason and fly in the face of justice to shoehorn illegal, unauthorized levies into levy limits moving forward. Doing so would be improper because it would be tantamount to undermining the will of the electorate. *See Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo. 1996) ("Courts

10

should not engage in a narrow or technical reading of language contained in an initiated constitutional amendment if to do [so] would defeat the intent of the people."). Understanding "prior year" to mean "prior [legally levied] year" is the only tenable approach.

¶76 In my view, the void as ultra vires framework avoids some of the potholes thrown into sharp relief by the dissent's beacon. But even assuming its points are valid, the dissent ultimately reaches the wrong result. For that reason, I join my brothers and sisters in the majority. However, I do so only as it relates to the affirmative answer to the two-part interrogatory.

## IV. Conclusion

¶77 In this unique and narrow set of circumstances, there is nothing in TABOR that requires the General Assembly or school districts to obtain voter approval before passing and implementing HB 21-1164. And while I ultimately rendezvous with the majority, I take a less obstructed path to reach our shared landing place. Therefore, I respectfully concur in the answer only.

11

CHIEF JUSTICE BOATRIGHT, dissenting.

¶78 Fully funded schools are essential, and the value of education cannot be overstated. The plain language of our state constitution, nevertheless, requires that the state or any local government entity obtain advance voter approval for "any new tax, tax rate increase, [or] mill levy above that for the prior year." Colo. Const. art. X, § 20(4)(a). Here, without voter approval, HB 21-1164 will increase the mill levy "above that for the prior year" in 127 school districts. The bill is projected to generate $91.7 million in additional property tax revenue in the first year and $145.5 million in the second year. This increase in revenue—which is expected to continue increasing over the next nineteen years in some districts— will be generated from property owners all across our state. Put simply, due to the mill levy increase, property owners will pay more taxes from one year to the next. That is the very definition of a tax increase under our constitution. Therefore, in my view, this bill violates our constitution by raising tax rates without voter approval. Accordingly, I respectfully dissent.

¶79 The majority concludes that HB 21-1164 is merely a legislative correction. Maj. op. ¶ 55. But to reach this conclusion, the majority must engage in some mental gymnastics: It asserts that because voters agreed to waive their school districts' revenue limits, they—by default—approved of the then-existing mill levy rates, and therefore, HB 21-1164 effectuates their implicit intent by returning

the *since-decreased* mill levy rates to the rates existing at the time of the waiver elections. *Id.* at ¶¶ 41, 49. In so reasoning, the majority relies on *Mesa County Board of County Commissioners v. State*, 203 P.3d 519 (Colo. 2009), to assert that the General Assembly has the authority to make such a "correction." The bill at issue in *Mesa*, however, imposed no tax increase. And of course, to reach its conclusion, the majority minimizes the fact that the elimination of the tax credits here, for all intents and purposes, is an increase in the effective tax rate. In short, I find the majority's rationale unpersuasive.

¶80 In 1992, Colorado voters adopted article X, section 20 of the Colorado Constitution ("TABOR"), an amendment designed to limit the amount of revenue the government can retain and prohibit the imposition of taxes without voter approval. Article X, section 20(4)(a) provides that districts must obtain advance voter approval for "any new tax, tax rate increase, *mill levy above that for the prior year*, . . . or a tax policy change directly causing a net tax revenue gain to any district." (Emphasis added.) There are no exceptions relevant to this case, and there is certainly no language qualifying "mill levy above that for the prior year." In fact, the provision uses the word "any."[1] Thus, it does not exempt a tax increase

---

[1] Despite the fact that "the word 'any' means 'all,'" *BP American Product Co. v. Colorado Department of Revenue*, 2016 CO 23, ¶ 18, 369 P.3d 281, 286, the concurrence adds qualifying language to the constitutional provision, suggesting

2

for the purpose of making a "correction." The majority recognizes our standards for interpreting constitutional provisions like this one. But instead of "giv[ing] the provision's terms their ordinary and plain meanings" or "effectuat[ing] the will of the people in adopting the measure," maj. op. ¶ 31, the majority, in effect, usurps the role of voters, approving of a state-wide plan to increase mill levy rates. Our standards for interpreting constitutional provisions should not be so easily cast aside.

¶81    This mill levy saga began over two decades ago when voters in 174 school districts waived the revenue limit imposed by TABOR, meaning the school districts could retain excess revenue. In so doing, however, voters did not approve of any tax rate increase, and they certainly did not vote to lock in the mill levy rate in effect at the time. To conclude otherwise, as the majority does, supplants voter intent, conflates tax revenue with tax rates, and raises concerns about the single-subject rule. In my view, HB 21-1164 is not the kind of legislative correction that our precedent permits. But regardless of whether this "correction" falls in line with precedent, at its core, the majority's approval of the tax credit elimination in

that any "mill levy above that  for the prior year" actually means any "mill levy above that for the prior *[legally levied]* year," conc. op. ¶ 69 (emphasis added). But that is not what the constitution says.

3

HB 21-1164 creates a loophole that circumvents TABOR's voter approval requirements. Finally, HB 21-1164 will have a different impact from one school district to the next, and I am concerned that this court's consideration of the interrogatory, without the benefit of a factual record, may be too hurried to account for districts' varying circumstances. Even though it would be difficult and time-intensive, because school funding is an extremely important issue and this action will affect so many property owners across the state, it should receive thorough consideration in ordinary judicial channels. I would, therefore, conclude that the interrogatory was improvidently granted. I take each contention in turn.

## I. Voters Have Not Approved this Tax Increase

¶82 Though often recognized for its complexity, at its essence, TABOR consists of two primary components that are relevant here. First, TABOR limits the amount of revenue that state and local governments may retain, meaning any excess revenue must be returned to taxpayers unless voters waive the revenue limit. Colo. Const. art. X, § 20(7). Second, TABOR requires voter approval for new taxes and tax rate increases. *Id.* at § 20(4). TABOR provides an opt-out: Citizens may vote to waive TABOR's revenue limit, and citizens may vote to increase tax rates; importantly, those two votes are completely independent of one another. *Id.* at §§ 20(4), 20(7). Here, the voters only voted on the revenue limit. Specifically, the majority of voters in 174 of Colorado's 178 school districts waived TABOR's

4

revenue limit.  Additionally, it is undisputed that there was never a vote asking to freeze the mill levy rate in effect at the time.  As a result, no voter agreed to the increases in mill levies that will begin to take effect next year.

¶83     In fact, 161 of the 174 ballot measures during the waiver elections explicitly warranted that waiver of the revenue limit would have *no effect* on mill levies, and that in the event of *any* future mill levy increase, voter approval would again be required.  Specifically, those measures commonly asked voters whether TABOR's revenue limit should be waived "provided, however, that *no local or property tax mill levy shall be increased at any time*, nor shall any new tax be imposed, *without prior consent of the voters.*"[2]  (Emphases added.)  This explicit assurance—at times, capitalized or underlined for emphasis—makes even more clear that voters never approved of, nor have they been asked to approve of, the tax rate increase that will occur from 2021 to 2022, and the nineteen subsequent years.[3]

---

[2] Although the ballot measure language varied from one district to the next, this language was most commonly used.  Some measures asked whether TABOR's revenue limit should be waived "without imposing any new taxes or increasing tax rates," and others noted that "nothing [therein] shall permit any increase in the property tax mill levy."

[3] For example, one ballot measure read: "Shall the Las Animas School District RE-1, Colorado be authorized to collect, retain and expend all revenues and other funds collected during 1995 and each subsequent year from any source, notwithstanding the limitations of Article X, Section 20 of the Colorado Constitution, effective January 1, 1995, provided, however, that no property tax

¶84 True, HB 21-1164 will eventually reinstate the mill levy rates in existence at the time of the waiver elections, but this does not effectuate voter intent. This is so because the voters in the waiver elections never voted to keep the mill levy rates the same, nor did they vote to change the mill levy rates. Rather, the only issue before the voters—and thus the only issue on which they conceivably could have expressed their intent—was whether TABOR's revenue limit should be waived. In other words, no one knows what the voters intended to do about the mill levy rates in their districts because they were never asked. But, the majority "*assume[s] that in voting to waive TABOR's revenue limits, school district voters understood that their votes were predicated on the continuation of the mill levy rates then in effect.*" Maj. op. ¶ 41 (emphasis added). That is a big assumption—one I am unwilling to make, and in my view, one that the constitution prohibits.[4] With the majority's decision today, voters must now be aware that any vote on revenue limits may act as permission to always maintain applicable tax rates at their

mill levy shall be increased at any time nor shall any new tax be imposed without the prior approval of the voters of the Las Animas School District RE-1." (Emphasis in original.)

[4] Even if the voters who waived the revenue limit also approved of the mill levy rates in effect at the time, their intent to keep mill levy rates the same is irrelevant because, since those elections, the mill levy rates have *decreased*, meaning that our constitution requires a new vote to *increase* those rates. Colo. Const. art. X, § 20(4)(a).

6

current levels.  Maj. op. ¶ 42 ("[I]n voting to waive the TABOR revenue limits . . . the voters who authorized those waivers necessarily approved the mill levies in effect at the time they voted.").

¶85    Furthermore, I find the majority's reasoning to be problematic because the majority opinion, itself, runs contrary to our single-subject rule.  Our state enforces a single-subject rule because we favor clarity in the issues we place before voters. *See, e.g.*, Colo. Const. art. V §§ 1(5.5),  21; *see also In re Proposed Initiative for 1997-98 No. 84*, 961 P.2d 456, 460 (Colo. 1998) (unless components of a ballot initiative encompass "a single definite object or purpose," the component that is not expressed in the ballot title is rendered void).  Here, the majority's rationale clearly assigns two subjects to one measure.[5]  First, it concludes that the voters waived the revenue limit.  Second, it concludes that voters approved of the then-existing mill levy rate for all future years.

---

[5] I recognize that "districts may consolidate ballot issues," Colo. Const. art. X § 20(3),  but I do not assert that the ballot measures here violated the single-subject rule.  I simply believe the majority's rationale in interpreting the ballot measures is concerning when juxtaposed with the policy underlying our single-subject rule. I would add that it does not matter whether districts *can* consolidate ballot issues because they did not do so here.  Most ballot measures applicable here clearly encompassed only one subject.  Indeed, most measures explicitly precluded the second subject that the majority now assumes.

7

¶86 But waiving the revenue limits and approving the mill levy rates are two different subjects that are "distinct and have separate purposes." *See In re Proposed Initiative for 1997–98 No. 84* at 460–61 (holding that a ballot measure proposing both tax cuts and reductions in state spending violated the single subject rule, while recognizing that "[v]oters would be surprised to learn that by voting for local tax cuts, they also had required the reduction . . . of state programs"). Seeing as this court has concluded that tax cuts and reduced spending constitute two subjects, surely waiver of revenue limits and approval of existing rates are similarly two subjects. It follows that the voters here would be surprised to learn that a waiver of TABOR's revenue limit was also permission to resume taxing at the then-existing rate at any time. And it goes without saying, but property owners across the state are going to be surprised when their property tax rates increase without their votes.

¶87 In an attempt to justify its decision that a vote to waive TABOR's revenue limit also implies permission to increase since-decreased tax rates back to their prior levels, the majority asserts that, in *Mesa*, we tied the tax rate to the revenue limit, such that they are one and the same. Maj. op. ¶ 41. From my perspective, we did no such thing. Of course, tax rates and tax revenue are related—one cannot have tax revenue without tax rates—but waiving the tax revenue limit is not the same as approving the tax rate. To me, *Mesa* makes this distinction clear. In that

8

case, we analyzed the constitutionality of SB 07-199, which froze mill levy rates and implemented the voters' waivers of TABOR's revenue limit. 203 P.3d at 526. We concluded that SB 07-199 was constitutional *because* it "did not establish a new tax or increase tax rates," but instead, it "simply applied [the] broad based waivers passed by school districts." *Id.* at 534. We also noted, several times, that "there [was] neither a new tax nor a tax rate increase at issue, but the removal of a revenue limit." *Id.* at 533; *see also id.* at 526, 534, 536. Thus, in my view, *Mesa* supports my conclusion by emphasizing that the lack of a tax rate increase is dispositive for determining whether TABOR applies.

¶88 Unlike in *Mesa*, the taxpayers here will see an increase in their mill levy rates as a result of HB 21-1164. The voters today did not approve of this, and neither did the voters in the late 1990s. Therefore, I would conclude that voter approval is required before HB 21-1164 can impose a "mill levy above that for the prior year." One can dispute the policy implications of such a conclusion because it affects school funding, and one can similarly debate the merits of TABOR's voter approval requirements, but as it stands, our constitution plainly requires advance voter approval prior to implementation of any "mill levy above that for the prior year." Recharacterizing this increase as a "correction" does not—and should not—alter the calculus.

9

## II. The General Assembly Does Not Have Authority to Make this Correction

¶89 Despite the fact that no voter has approved of HB 21-1164's effective tax rate increase, the majority endorses this legislation by concluding that the General Assembly is within its authority to make this "correction." Because there was no evidentiary hearing on this matter, we don't know exactly what the Colorado Department of Education's ("CDE") guidance to the school districts was.[6] We do know, however, that the school districts hold the authority for setting their mill levy rates. *Mesa*, 203 P.3d at 528. And again, because there was no evidence taken, we don't know why the districts actually opted to reduce their mill levy rates. Perhaps property values increased beyond expectations? I don't know. But because of the procedural posture here, we can't be sure why the school districts decreased their mill levy rates, and therefore, we can't be sure of what exactly the General Assembly seeks to "correct."

¶90 I do agree with the majority that only the school districts have the authority to adjust their mill levy rates. Maj. op. ¶ 38 ("[O]nly the school districts are in a position to impose or effectuate any new tax, tax rate increase, mill levy above that

---

[6] The concurrence emphasizes that the CDE "*improperly forced*" school districts to decrease their mill levy rates. Conc. op. ¶¶ 63–64. But again, without a factual record, I am unwilling to make assumptions about the CDE's guidance or districts' implementation of such guidance.

for the prior year, or tax policy change directly causing a net tax revenue gain to any district."). But if only the school districts have such authority, then what is the General Assembly's authority to "correct" the school districts' decisions by imposing a mill levy increase? In other words, even if TABOR does not apply to this situation, why isn't it the school districts' responsibility to correct any "mistakes"? To me, the majority is inconsistent when it highlights the school districts' exclusive authority to increase mill levies on the one hand, maj. op. ¶ 38, yet endorses the General Assembly's authority in HB 21-1164 to increase mill levies on the other, maj. op. ¶ 52. The majority explains away this inconsistency by citing back to the basis for its conclusion—that HB 21-1164 does not impose a tax increase—but the fiscal note for HB 21-1164 expressly notes "district level impacts," which include increased mill levy rates in 127 districts. With this clear indication that HB 21-1164 imposes a tax increase, I can't agree that the General Assembly is acting within its authority to "correct" the school districts' rates.

¶91     And while I don't doubt the General Assembly's authority to correct errors in taxation, I am skeptical that this multi-year phasing out of tax credits is the type of "correction" that is contemplated by our case law. From my perspective, none of the cases cited by the General Assembly are analogous to the issue before us, and I am unpersuaded by the majority's reliance on those cases.

11

¶92 In *Bruce v. Pikes Peak Library District*, 155 P.3d 630, 632 (Colo. App. 2007), a division of the court of appeals concluded that a district could increase its mill levy without voter approval because voters had already approved of the mill levy increase. In that case, unlike here, the voters in the district actually voted on the mill levy rate, agreeing to "increase the maximum tax levy from two mills to no more than four mills for public library funds." *Id.* Because the voters expressly agreed to a four-mill maximum, and the district never exceeded that maximum, voter approval was not required. *Id.* If the ballot measures here included *any* language about setting a mill levy rate, I might be more persuaded by the majority's reliance on *Bruce*, but because the ballot measures here only pertained to revenue limits, I do not find *Bruce* persuasive.

¶93 In my opinion, *Huber v. Colorado Mining Ass'n*, 264 P.3d 884 (Colo. 2011) is equally unpersuasive. In *Huber*, where the Colorado Department of Revenue failed to collect taxes in accordance with the coal severance tax formula, we concluded that the Department did not need voter approval to implement and adjust the coal severance tax according to that statutory formula. *Id.* at 893. The taxpayers in that case argued that voter approval was required each time the Department calculated an increase in accordance with the statutory formula. *Id.* at 887 ("Colorado mining asserts that, whenever the Department calculates an upward adjustment in the amount of tax due under the statute, it must obtain

12

voter approval."). I am not aware of any non-discretionary statutory formula that school districts across Colorado are currently failing to follow in calculating their mill levy rates. Furthermore, I don't find a "non-discretionary duty required by a *pre-[TABOR]* taxing statute," *id.* (emphasis added), to be analogous to the discretionary action taken by the General Assembly here, post-TABOR.[7] The General Assembly can make corrections, just as the Department did in *Huber*, but it cannot violate the constitution in doing so. Today, unlike when the statute in *Huber* took effect, voter approval is required for any tax rate increase.

¶94 Finally, I am not convinced that the reasoning in *Bolt v. Arapahoe County School District No. Six*, 898 P.2d 525 (Colo. 1995), is applicable here either. In *Bolt*, taxpayers challenged the constitutionality of a statute that required their school district to include abatements and refunds in its mill levy. *Id.* at 528–29. This "abatements and refunds mill levy" allowed the school district to recoup revenue that was lost as a result of the county assessor's errors in property valuation. *Id.* at 537. We noted that the levy "[did] not operate as a tax increase" and "[did] not increase the overall tax burden on the taxpayers." *Id.* Ultimately, we approved of

---

[7] "[T]he voter-approval requirements of section 4(a) apply only to new taxes, tax rate increases, and tax policy changes adopted by legislative bodies after November 4, 1992." *Huber*, 264 P.3d at 891.

the school district's adjustment of the mill levy rate to collect taxes that property owners would have owed but for errors in property valuation.[8]  *Id.*  We did not broadly approve of mill levy increases without voter approval.  Rather, we clarified that TABOR "does not require the school district to obtain voter approval for every tax or mill levy, but only for those taxes which are either new or *represent increases from the previous year*."  *Id.* at 534 (emphasis added).  What the General Assembly seeks to do here—impose a state-wide tax rate increase—is not analogous to a school district accounting for revenue lost as a result of a county assessor's errors.  Furthermore, the CDE's guidance to districts to decrease their mill levy rates—though perhaps mistaken—is nothing like a mere miscalculation of property values by a local assessor.  Here, the tax rates will incrementally increase for up to nineteen years.  Given these distinctions, I am not persuaded that HB 21-1164's tax increase is a "correction" under our current law.

---

[8] In *Bolt*, we noted that the abatements and refunds levy "simply moves [the mill levy] adjustment to the following year or years, and *does not operate as a tax increase*."  898 P.2d at 537 (emphasis added).  We explained that, "if the school district knew before certifying its mill levy for the next year that the upcoming mill levy of 'x' mills would fail to produce the anticipated revenue due to errors in the assessor's valuation of the property, the school district would adjust the mill levy accordingly to compensate for the shortfall."  *Id.*  HB 21-1164 is nothing like an "adjustment" to compensate for shortfalls resulting from a county assessor's errors.

¶95 I have additional concerns about the majority's approval of this new two-step "correction." The General Assembly passed legislation, HB 20-1418, just last year, requiring that school districts increase their mill levy rates to reverse previous rate reductions.[9] This legislation also required that school districts grant property tax credits to account for any increase, so property owners never actually paid higher rates. By coupling a mill levy rate increase with tax credits one year and then eliminating those tax credits the next year, the General Assembly effectively increases tax rates without voter approval. The majority condones this two-step maneuver by holding that "the gradual elimination of the tax credits previously adopted in House Bill 20-1418 does not impose or effectuate a new tax, tax rate increase [or] mill levy above that for the prior year." Maj. op. ¶ 56. In simple terms, by approving a "gradual elimination of tax credits" the majority allows the General Assembly to increase mill levy rates that are off-set by tax credits one year, then allows the General Assembly to eliminate those tax credits in the following years. I cannot view this as anything other than a tax rate increase

---

[9] While HB 20-1418 is not before us here, I question the constitutionality of this legislation as well. It seems that HB 20-1418 required school districts to increase their mill levy rates, and although taxpayers did not see an increase in the amount they paid because of off-setting tax credits, the bill nonetheless imposed a "mill levy above that for the prior year."

that circumvents TABOR's voter approval requirements. And although the majority issues a narrow ruling, the narrowness of the opinion does not allow HB 21-1164 to pass constitutional muster.

¶96 By the same token, I fear that the majority's ruling draws a technical distinction that undermines the will of the electorate. *See Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo. 1996) ("Courts should not engage in a narrow or technical reading of language contained in an initiated constitutional amendment if to do [so] would defeat the intent of the people."). From the perspective of Colorado's property owners, it is irrelevant whether the General Assembly simply increases tax rates or uses this two-step maneuver to increase tax rates because the practical effect is the same: The mill levy rates will be "above that for the prior year," and consequently, property owners will pay more in taxes. This falls plainly within the purview of TABOR's voter approval requirements. Thus, by calling this a "correction," the majority reaches a desirable result for school funding, but it does so at the expense of our constitution's plain language and the rights of voters.

¶97 Like the majority, the concurrence overlooks the plain language of the applicable constitutional provision. Under the concurrence's reasoning, we should refer back to the mill levy rates in effect at the time of the waiver elections as the last "legally levied" rates because, in its view, the districts' mill levy

16

reductions made pursuant to the CDE's guidance are void as ultra vires acts.[10] Conc. op. ¶¶ 65, 69. But my logic still stands: As a result of HB 21-1164, mill levies will be "above that for the prior year," thus imposing a tax increase on property owners across the state. Neither voiding mill levy rates nor recasting this increase as a "correction" can change this plain and simple fact.

### III. This Interrogatory was Improvidently Granted

¶98 The General Assembly recognizes that HB 21-1164's mandate "may lead to different funding outcomes across school districts" and that "school districts have different mill levies and may require different levels of correction." But it contends that this interrogatory was providently granted because it is a "pure legal question" that only this court can answer. Now that briefing and argument have occurred, I would dismiss this interrogatory as improvidently granted.

¶99 Under our state constitution, "[t]he supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives." Colo. Const. art. VI, § 3. While we

---

[10] Even if we were to accept the argument that the mill levy rates from 1995 to 2006 are somehow "void," why would the mill levy rates from the 1990s serve as the reference point for setting mill levy rates today rather than the rates beginning in 2007? In *Mesa*, we approved of SB 07-199, which froze the mill levy rates in 2007, meaning districts' rates were at least "legal" since 2007. So, if our reference point is the last "legal" rate (though I don't agree that our constitution supports such an interpretation), then why wouldn't the current rates serve as the reference point?

17

have no absolute rule for what constitutes a "solemn occasion," we have declined to exercise our jurisdiction to answer questions "that call for 'hasty consideration' rather than the thorough analysis the interrogatories require" and "questions that readily could be addressed through ordinary judicial channels." *In re Interrogatory on House Joint Resol. 20-1006*, 2020 CO 23, ¶ 27, __ P.3d __ (first citing *In re House Bill No. 1503 of Forty-Sixth Gen. Assembly*, 428 P.2d 75, 76–77 (Colo. 1967), then citing *In re Senate Resol. Relating to Senate Bill No. 65*, 21 P. 478, 472–73 (Colo. 1889)). Although I maintain that the straightforward application of TABOR's requirements provides the proper legal analysis, I believe this question warrants more thorough consideration, and I further believe that ordinary judicial channels could provide such thorough consideration with the development of a factual record.

¶100 Without knowing more, we cannot adequately account for the varying circumstances that each district faces. During the waiver elections, the ballot measure language varied from one district to the next, and the information provided to voters in their bluebooks likely varied as well. Further, it seems that most school districts received the CDE's direction to comply with TABOR's revenue limit, but it is unclear whether all districts received the direction, and if they did, whether that direction was the sole reason for each and every mill levy decrease. In fact, the petition itself introduces ambiguity as to what guidance or

18

advice the CDE provided and how it was followed.[11]  Regardless, HB 21-1164 will lead to different outcomes in each district, and without understanding the circumstances in each district, our court is left ill-equipped to decide the issue in this procedural posture.  The complexity of both the circumstances and the legal question presented suggest that we should have declined to answer this interrogatory.[12]  And now, we should dismiss the petition as improvidently granted.  The better approach would be to wait for it to inevitably come before us after going through the proper judicial process.  HB 21-1164's wide-reaching and significant impact on education is all the more reason to have this issue considered in that manner rather than requiring this court to craft a one-size-fits-all holding.

---

[11] The Petition to Accept Interrogatory states, "WHEREAS, Despite the waiver elections, the [CDE] continued to instruct *each school district* to limit its total program mill levy to no more than the number of mills that could be imposed under the school district's TABOR property tax revenue limit . . . ."  (Emphasis added.)  But the petition, just one clause below, states, "WHERAS, Between 1998 and 2007, CDE, without authority to do so, instructed *over 100 school districts* to reduce their total program mill levies to remain under their TABOR property tax revenue limits . . . ."  (Emphasis added.)  Therefore, it is unclear to me whether all school districts received guidance from the CDE, which instills some doubt as to whether there is anything to "correct" in those districts that did not receive CDE guidance.  Of course, this ambiguity becomes moot with the majority's decision today.

[12] The concurrence introduces additional uncertainty into the events leading up to this legislation.  Why did the General Assembly declare all mill levies from 1994 to 2006 "void" in HB 20-1418 (passed in 2020) but not in SB 07-199 when it first acknowledged the decrease in mill levy rates?

19

## IV. Conclusion

¶101   For the foregoing reasons, I respectfully dissent.